2021 IL App (2d) 190271
No. 2-19-0271
Opinion filed May 12, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Nos. 17-CF-204 17-TR-3769 |
| KYLE A. DELHAYE, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Hutchinson and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a bench trial, defendant, Kyle A. Delhaye, was convicted of felony and misdemeanor aggravated unlawful use of an electronic communication device. Defendant appeals his convictions and seeks to vacate them on grounds that the charges were subject to compulsory joinder with his traffic citation for failure to reduce speed to avoid an accident. He also challenges the sufficiency of the evidence to support the convictions. For the following reasons, we affirm.

¶ 2                                   I. BACKGROUND

¶ 3    On the afternoon of October 11, 2016, Selma Martinez drove her car northbound on Route 47 near Yorkville. Martinez's two daughters, Ashley and Angela Lopez, were passengers in the

car. Angela sat in the front seat, and Ashley sat in the backseat. Meanwhile, defendant drove a pickup truck, also northbound on Route 47. As Martinez prepared to turn left onto Corneils Road from the single northbound lane on Route 47, defendant's truck struck the rear of Martinez's car. Ashley died from the injuries she sustained in the collision, Martinez suffered extensive injuries, and Angela suffered a concussion and a laceration to the head.

¶ 4                                    A. Traffic Citation

¶ 5      On the day of the collision, October 11, 2016, Yorkville police officer Matthew Nelson issued defendant a uniform traffic citation, on an "Illinois Citation and Complaint" form, for failure to reduce speed to avoid an accident, in violation of section 11-601(a) of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11-601(a) (West 2016)). On January 25, 2017, defendant pled guilty to the charge and was sentenced to three months of court supervision, assessed fines and costs of $250, and ordered to attend driving school. In accepting defendant's guilty plea, the trial court admonished defendant that "[t]his Court only addressed the issue of whether or not you violated a traffic law, and whether or not—how you should be punished based upon that petty offense" and that "it's for other and different courts that are going to address the issue of the consequences of what you did."

¶ 6                                    B. Criminal Charges

¶ 7      On July 7, 2017, the State filed a two-count felony information against defendant for aggravated unlawful use of an electronic communication device in violation of section 12-610.2(b-5) of the Vehicle Code (*id.* § 12-610.2(b-5)). One count was based upon Ashley's death; one count was based upon great bodily harm to Martinez. The charges were superseded by indictment on August 8, 2017, for a felony violation of section 12-610.2(b-5) based upon Ashley's death. Also, a day earlier, on August 7, 2017, the State filed a criminal complaint against defendant for a

misdemeanor violation of section 12-610.2(b-5) based upon great bodily harm to Martinez. The indictment and the criminal complaint stated that defendant "operated a motor vehicle while using an electronic communication device to read an electronic message."

¶ 8                                    C. Pretrial Motions

¶ 9      On July 25, 2017, defendant moved to dismiss the information on the ground that the State violated the compulsory-joinder statute (720 ILCS 5/3-3 (West 2016)) by bringing the charges after defendant pled guilty to failure to reduce speed to avoid an accident, on January 25, 2017, and after his court-supervision period ended on April 19, 2017. An evidentiary hearing was held on the motion on October 5, 2017, at which the lead investigator, Yorkville police detective Patrick McMahon, testified. McMahon stated that a data extraction was performed on defendant's cell phone on October 17, 2016. McMahon explained that he was present for the extraction process but that he did not conduct the extraction, because he had not received training on the extraction device. McMahon reviewed the data and generated a report on October 18, 2016. The data included text messages between defendant and Crystal Daniels on the afternoon of the accident. McMahon acknowledged that he did not conduct any additional phone analysis after October 18, 2016.

¶ 10     The parties stipulated that McMahon's October 18, 2016, report, "which contained the times text message[s] were sent and received and the content of the text messages from Defendant's phone on 10/11/16 was in the State's Attorney's possession & tendered to the defendant on 1/12/17 in 16 TR 6563." The parties further stipulated that the "full phone data from extract[ion] was not yet tendered prior to Jan. 25, 2017."

¶ 11     McMahon further testified that the Illinois State Police performed an initial investigation on November 2, 2016, and that he received the Illinois State Police accident reconstruction report on June 20, 2017. McMahon acknowledged that the report pertained to "mathematical calculations

in terms of the speed of the car and how the crash occurred" and not whether text messages were sent and received on defendant's cell phone.

¶ 12    The trial court denied defendant's motion to dismiss in an October 18, 2017, written order. The trial court pointed out that, at the time the charges were filed against defendant on July 7, 2017, the failure-to-reduce speed case already had been terminated. Thus, the trial court reasoned, "there was no pending case to be joined, for purposes of the joinder statute." Accordingly, "[i]t would have been impossible at the time the felony case was filed to seek to join the traffic case for the purpose of having a single prosecution as contemplated by the joinder statute." Moreover, the trial court reasoned, under our supreme court's decision in *People v. Jackson*, 118 Ill. 2d 179 (1987), *overruled in part on other grounds by People v. Stefan*, 146 Ill. 2d 324 (1992), the compulsory-joinder statute does not apply to offenses that have been charged by the use of a uniform citation and complaint form for traffic offenses.

¶ 13    On January 11, 2018, defendant again moved to dismiss the two-count information, this time on the ground that the prosecution for aggravated use of an electronic communication device violated his right against double jeopardy. The State moved to strike or, alternatively, deny the motion. On March 13, 2018, the trial court denied the State's motion to strike and, following argument, denied defendant's motion to dismiss. The trial court noted that "the fact there was a collision is not evidence of violation of failure to reduce speed to avoid an accident." The trial court concluded: "I do not believe this is a case where the lesser-included offense precludes this prosecution."

¶ 14                                      D. Trial

¶ 15    A bench trial was conducted on December 17 and 18, 2018. Defendant moved for a directed finding at the close of the State's case; the trial court denied the motion.

¶ 16                                    1. The Collision

¶ 17    The evidence established that, on the day of the collision, October 11, 2016, defendant was employed by Ralph Helm, Inc., which serviced outdoor power equipment. Defendant's job was to pick up the equipment from customers for servicing and return the equipment to the customers upon completion of servicing. Defendant drove a company pickup truck on the day of the collision.

¶ 18    Martinez testified that she and Ashley picked up Angela from work at the store Boombah on Boombah Way in Yorkville just before 3 p.m. on the day of the collision. Martinez drove her black Nissan Altima. Martinez planned to show Angela an alternative driving route home—north on Route 47 and left on Corneils Road. The evidence established that Route 47 at this juncture is a two-lane north-south highway with a 55-mile-per-hour speed limit. There is no stop sign or left-turn lane at Corneils Road. Martinez testified that she used her turn signal as she waited one to two minutes to make the left turn onto Corneils Road. She did not see any vehicles behind her at this point. Angela testified that her mother had her turn signal on and was pointing out the Corneils Road sign before Angela heard a loud crash.

¶ 19    The parties stipulated that the first 911 call came in at 3:03:18 p.m. on October 11, 2016, from a caller named "Miles," who was not a witness to the crash. On the recorded call, Miles stated that he missed the crash by "about a minute" and indicated that there were "about 10 people" helping at the scene of the collision. The parties further stipulated that Yorkville police officers were dispatched to the scene at 3:03:40 p.m.

¶ 20    Jessica Romero testified that, shortly before 3 p.m. on October 11, 2016, she drove southbound on Route 47 to Yorkville. She "barely remember[ed]" seeing "a black car that was coming" as she approached the intersection of Route 47 and Corneils Road. When she reached the intersection, she heard "noise like a crash, like something very loud." Debris, soil, and glass fell

on her car. Romero's windshield was broken. She stopped, exited her car, and proceeded toward the car involved in the crash. A man and a woman had stopped and were at the scene. Romero "saw that the woman [who] stopped was dialing 911." When questioned as to how much time passed between when the objects hit her car and when she first "heard" someone calling 911, Romero responded: "I would say maybe a minute. Maybe a minute or two minutes maximum." She also stated that she did not know whether it was the man or the woman who was the first to call 911.

¶ 21    Nelson testified that, at about 3:03 p.m., he was dispatched to the scene. When he arrived, he saw "the black Nissan on the west edge of Route 47." The car had "severe rear end damage" with the trunk "pushed up over the rear axle." The driver was "slumped sideways towards the front seat passenger," and the front-seat passenger was "disoriented and being assisted by the paramedics." Nelson saw "hair coming up between" the front seat and the backseat but did not see a body beneath the hair. Nelson also saw "a red Chevy Silverado just north of that in the field with front end damage." Defendant was standing next to the vehicle. Nelson further stated that the intersection of Boombah Way and Route 47 is "[l]ess than half a mile" from the intersection of Corneils Road and Route 47.

¶ 22    Nelson testified that, after speaking to individuals at the scene, he issued defendant a traffic citation that day for failure to reduce speed to avoid an accident. A certified copy of defendant's conviction of this offense was introduced into evidence without objection, to show defendant was driving the vehicle involved in the crash. Nelson drove defendant to the hospital. Nelson did not know how long defendant sat in the back of the squad car before they drove to the hospital, but he testified that they arrived at the hospital around 4:20 p.m. En route to the hospital, Nelson requested defendant's verbal consent to provide his cell phone. Nelson testified that "I believe he gave it

[(defendant's cell phone)] to me when we got to the hospital." Nelson returned to the police station that day and placed the cell phone into evidence. Defendant provided written consent the next day to search the cell phone.

¶ 23    Defendant's employer, Ralph Helm, testified that he drove to the intersection of Route 47 and Corneils Road on October 11, 2016, after defendant called Helm to advise that he had been in an accident. Helm testified that his company's standard business practice was to provide drivers with clipboards containing information regarding scheduled pick ups and deliveries. After receiving permission from a police officer, Helm removed the following items from the pickup truck defendant had been driving: a clipboard, a check, a navigational device, and a battery jumper pack. Helm testified that no police officer requested to photograph any of the items removed. Helm also removed, with permission from a police officer, an 18-foot trailer that was attached to the pickup truck.

¶ 24    Daniels, defendant's girlfriend at the time, testified that she and defendant engaged in a series of text messages on October 11, 2016, that began with a text message from Daniels shortly before 3 p.m. Defendant responded "[a]lmost immediately." Daniels testified that the text-message conversation lasted several minutes and that it was constant. Every time she sent a text message, defendant replied. Eventually, however, Daniels sent defendant several text messages to which he did not reply.

¶ 25    Later, in the evening hours after the collision, she received a friend request on her Facebook account from an account with the name Tyler Fletcher. She accepted the friend request and received several messages, at which point she realized that the messages were from defendant. The evidence established that defendant had created the account four years earlier. The sequence of messages read:

"Hey it's me this is a spam account I can't really talk right now but I'm okay I need you to not call text or snap my phone it's not in my possession.

Don't use my name

I was in a very bad accident and it's going to cause lots of legal troubles ill get back to u when I can I'm so sorry I'm out of the hospital and I'm at home

And you can't tell a soul that I told you that[.]"

¶ 26    The parties stipulated that, as a result of the crash, Martinez suffered multiple injuries resulting in great bodily harm. The parties also stipulated to testimony that the cause of Ashley's death was multiple blunt force injuries resulting from the pickup truck striking the car.

¶ 27                                    2. The Investigation

¶ 28    McMahon testified regarding the subsequent investigation. On October 17, 2016, after Yorkville police detective Sergeant Ray Mikolasek removed defendant's cell phone from the evidence vault, they went to the Kendall County Sheriff's Department to use the department's Cellebrite device on defendant's cell phone. McMahon explained that a Cellebrite device is a "forensic extraction device which is used for digital forensics to access readily viewable information on digital devices as well as information that may have been hidden or deleted."

¶ 29    McMahon testified that he had not used the Cellebrite device prior to this date (although he has used it approximately 7 to 10 times since then), but he received contemporaneous instruction from Mikolasek. McMahon described the device and explained the process. Namely, "[o]nce turning the device on, it gives you a few prompts, it walks you through the entire process to download [the] phone" to be examined. "And once you hook the phone up to the Cellebrite machine with a memory card to transfer the recovered information to, the machine walks you [*sic*] what you want, whether it's an extraction which provides the user with only what's visible on the

phone, or there's a physical extraction which offers what's visible as well as what is not really visible, which means deleted or hidden data." The data recovered from an extraction includes "everything, call logs, phone books, who the contacts are. MMS messages, SMS messages, which are short message service, which are your text messages. Videos. Pictures you take, images you save." The extraction may also recover conversations on a third-party application, such as Snapchat.

¶ 30    McMahon testified that Mikolasek "walked me through how to use the device," at which time "we performed the extraction on the defendant's cell phone" by connecting the phone to the Cellebrite device and following the prompts. McMahon further explained his collaboration with Mikolasek on the Cellebrite extraction: "We were sitting right next to each other while he was explaining to me how the process is done and how you use the machine. So I was right there. I don't recall who completed it. But we were right there together."

¶ 31    A report with 4488 pages of data was generated; they downloaded the information to a flash drive. McMahon proceeded to review the report over the next couple of days. He testified that the report included a 10-message text conversation between defendant and Daniels on the day of the collision, October 11, 2016, with the time stamped, as follows:

> 2:58:15 p.m. Daniels: "I can just log into my snapchat."
>
> 2:58:25 p.m. Defendant: "Good"
>
> 2:59:06 p.m. Daniels: "Yeah. I have so much to say tonight. Honestly"
>
> 2:59:25 p.m. Defendant: "Write it down as soon as possible."
>
> 3:00:18 p.m. Daniels: "I will. I have a feeling this talk tonight won't be fun. But I am gonna be honest with u"
>
> 3:00:50 p.m. Defendant: "It's not going to be fun I'm saying it right now."

3:01:29 p.m. Daniels: "I know but to be honest I have been holding in so many feelings. Like u have no idea."

3:01:31 p.m. Defendant: "Idk of [*sic*] you checked snapchat yet but I want 100% honesty whether it's good or bad news or else I have nothing left to say to you"

3:01:51 p.m. Defendant: "I can't stand lying to my face."

3:01:55 p.m. Daniels: "U can be mad as much as u can but it's not all my fault. U had a lot to do with it to [*sic*]"

¶ 32 There were three additional text messages from Daniels to defendant, with the time stamped, as follows:

3:03:02 p.m. Daniels: "Yeah I know. I want honesty from u as well"

3:03:31 p.m. Daniels: "Yeah I can't stand someone messing with my feelings right now"

3:03:38 p.m. Daniels: "For how long"

¶ 33 McMahon testified that the Cellebrite report showed that all 13 of these text messages had been deleted from defendant's cell phone. However, the text messages were recovered during the extraction process. He acknowledged that the report did not reflect when the text messages were deleted. McMahon further testified that the report showed that text messages on defendant's cell phone from earlier in the afternoon and later in the afternoon had not been deleted.

¶ 34 McMahon explained that the time stamps in the report reflected when each text message was sent or received. He acknowledged that the report reflected only that the messages were read, but not when the messages were read. He also acknowledged that the report did not reflect whether defendant created the texts by "text talk," *i.e.*, "hold[ing] the phone with the application to text" and "speak[ing] into the phone" and "dictat[ing] to the phone what you want the message to read."

¶ 35    McMahon testified regarding additional content from the Cellebrite extraction. Namely, the extraction showed 10 Snapchat videos of defendant in the pickup truck created on the day of the collision, each approximately 10 seconds or less, in which defendant was driving while listening to music and singing along or nodding his head. Five of the videos were created between 1:14 p.m. and 2:06 p.m. and were deleted at approximately 3:23 p.m.—after law enforcement arrived at the scene. Four videos were created between 1:01 p.m. and 1:08 p.m. and deleted between 1:37 p.m. and 1:38 p.m. One video was created at 9:54 a.m. and deleted at 10:46 a.m.

¶ 36    Defendant objected to the admission of the Snapchat videos on relevance grounds. Citing *People v. Morales*, 2012 IL App (1st) 101911, the State argued that the videos were a continuing narration of crimes committed that day and not other-crimes evidence. The trial court agreed and overruled defendant's objection, finding that the evidence provided context for the charged offenses. McMahon proceeded to testify that, in the videos, defendant was leaning toward the camera and the phone was being moved while filming as if someone was holding it.

¶ 37    McMahon also testified regarding his assistance in conducting the reconstruction analysis. On November 2, 2016, he accompanied Illinois State Police officers to the impound lot where the vehicles had been towed. A lightbulb from the rear of Martinez's Nissan was secured as evidence. On November 2, 2016, McMahon accompanied the officers to the collision scene. McMahon acknowledged that he told Illinois State Police sergeant Richard Vanko that the driver of the pickup truck may have been using an electronic communication device or looking for a clipboard at the time of the crash.

¶ 38    Vanko testified as an expert in the field of traffic crash reconstruction. He testified that he was contacted on October 21, 2016, to assist in the reconstruction of the accident in this case. He stated an Illinois State Police accident reconstruction report usually takes about six months to

complete after an accident. Vanko detailed his investigation. Vanko assisted McMahon in executing a search warrant to obtain an image of the pickup truck's event data recorder. He explained that an event data recorder is a device that "records precrash data, crash impulse data, and it will give a snapshot of what the vehicle was doing at the time of the crash." Vanko noted that Martinez's Nissan did not have "a module that can be read or records precrash data that we have the ability to read." Vanko further testified that the lightbulb recovered from Martinez's car was from the rear right brake light. Based upon the "stretching in the filament" of the lightbulb, Vanko believed that the brake light was activated at the time of the collision. Vanko acknowledged that he could not determine whether the Nissan was stopped or just slowing down.

¶ 39    In addition to reviewing the image of the pickup truck's event data recorder, inspecting the vehicles, and receiving the case file, Vanko inspected the collision scene on November 2, 2016. He testified that, "[a]fter comparing the original photos from the day of the crash with what I was looking at, I marked with a can of paint the marks that I wanted to measure later that I was certain were from the day of the crash." The markings included tire marks, gouges, and scratches. Vanko testified that he saw no evidence in the photographs or on the roadway of preimpact braking by the pickup truck, such as skid marks or an impending skid mark. Vanko was able to determine a path of travel for the pickup truck and observed tire marks indicating postimpact braking as the pickup truck crossed into the shoulder of the southbound lane. Vanko documented the scene and subsequently created a forensic diagram of the scene.

¶ 40    Vanko later performed analyses of the relative speed of the vehicles in the collision. Vanko opined that defendant's pickup truck was traveling at the speed of 63 to 66 miles per hour at the time of impact. He also opined that there was no preimpact braking by defendant's pickup truck and that there was no postimpact braking by the truck until it had traveled 137 feet. When

questioned as to whether there was any diagnostic information showing preimpact braking by the truck, notwithstanding the absence of any physical evidence of preimpact braking, Vanko explained that the diagnostic information showed that the brakes were activated a half-second before the airbags deployed. Vanko acknowledged that he could not determine the actual time of the impact based upon his analysis of the data. He also acknowledged that he reached no conclusion as to what defendant was doing at the time of the crash, other than driving.

¶ 41    The case proceeded to closing argument. During its closing argument, the State referred to defendant's failure-to-reduce-speed-to avoid-an-accident guilty plea as a basis to establish the preliminary element of aggravated unlawful use of an electronic communication device—that defendant was driving a motor vehicle. Following the State's closing argument, defendant renewed his motion to dismiss the charges on double jeopardy grounds. He argued that the failure-to-reduce-speed charge was a lesser included offense of aggravated unlawful use of an electronic communication device, as evidenced by the State's reliance on the conviction to establish an element of the offense. The trial court denied the motion.

¶ 42                                    E. Guilty Finding

¶ 43    Following closing argument, the trial court found defendant guilty of felony and misdemeanor aggravated unlawful use of an electronic communication device. The trial court noted that it "heard the testimony of witnesses over the past two days and observed the demeanor of the witnesses as they testified on direct examination and cross examination." The trial court found that Daniels, Romero, Martinez, Lopez, and Helm testified credibly regarding the events of the date of the collision. The trial court further found that Nelson, McMahon, and Vanko testified credibly regarding their investigation and the accident reconstruction.

¶ 44 The trial court reasoned that the State met its burden of proving beyond a reasonable doubt the elements of the offenses charged: that defendant was operating a motor vehicle upon a roadway; that defendant was using an electronic communication device (a handheld wireless telephone), that defendant was involved in a motor vehicle accident, that the accident resulted in Lopez's death and Martinez's injuries, and that defendant's use of the electronic communication device while driving was the proximate cause of the death and injuries. The trial court also noted that "[t]here has been testimony regarding the actions of [defendant] following the collision." However, the trial court found, "the State's evidence, without the testimony concerning the actions of [defendant] in the minutes and hours after the collision, is sufficient to prove beyond a reasonable doubt each of the elements which the State must prove."

¶ 45                                    F. Posttrial Motion

¶ 46 Defendant timely filed a motion to reconsider on grounds that the admission of the Snapchat videos was erroneous, that their exclusion would warrant a finding of not guilty based upon insufficiency of the evidence, and that the prosecution for aggravated unlawful use of an electronic communication device violated his right against double jeopardy. Defendant sought a finding of not guilty or dismissal of the charges. On March 8, 2019, following argument, the trial court denied the motion.

¶ 47                                    G. Sentencing

¶ 48 A sentencing hearing proceeded on March 8, 2019. In a combined order, defendant was sentenced to 180 days in jail and 30 months' probation (until September 8, 2021) on the felony charge of aggravated unlawful use of an electronic communication device and 24 months' probation (until March 8, 2021) on the misdemeanor charge of aggravated unlawful use of an electronic communication device. Defendant was ordered to pay court costs and fees and $3200 in

fines ($2000 for the felony conviction and $1200 for the misdemeanor conviction). He also was ordered to perform 120 hours of community service, including 30 hours in a morgue.

¶ 49     Defendant timely appealed.

¶ 50                                   II. ANALYSIS

¶ 51     Defendant argues that the charges for aggravated unlawful use of an electronic communication device were subject to compulsory joinder with the traffic citation for failure to reduce speed to avoid an accident. He also challenges the sufficiency of the evidence to support his convictions of aggravated unlawful use of an electronic communication device.

¶ 52     Preliminarily, however, defendant argues extensively that we have jurisdiction over the appeal from the misdemeanor conviction, notwithstanding the omission of the misdemeanor case number from his notice of appeal and amended notice of appeal. We already ruled on this issue. In a January 31, 2020, order, we denied as untimely defendant's renewed motion for leave to file a second amended notice of appeal but found that a liberal reading of the amended notice of appeal included an appeal from the misdemeanor conviction. We reiterate that we have jurisdiction over the misdemeanor conviction.

¶ 53     We turn to defendant's arguments.

¶ 54                               A. Compulsory Joinder

¶ 55     Defendant argues that his separate prosecutions for failure to reduce speed to avoid an accident and aggravated unlawful use of an electronic communication device violated the compulsory-joinder statute. We disagree, as set forth below.

¶ 56     Section 3-3 of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/3-3 (West 2016)) governs multiple prosecutions for the same act and requires the compulsory joinder of certain offenses in a single prosecution. *People v. Quigley*, 183 Ill. 2d 1, 6-7 (1998). Specifically, "[w]hen

the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense." 720 ILCS 5/3-3(a) (West 2016). However, "[i]f the several offenses are known to the proper prosecuting officer at the time of commencing the prosecution and are within the jurisdiction of a single court, they must be prosecuted in a single prosecution, except as provided in Subsection (c) [(where the court may order separate trial in the interest of justice)], if they are based on the same act." *Id.* § 3-3(b). Section 3-3 "was enacted to prevent the prosecution of multiple offenses in a piecemeal fashion and to forestall, in effect, abuse of the prosecutorial process." *Quigley*, 183 Ill. 2d at 7.

¶ 57    In turn, section 3-4(b)(1) of the Criminal Code (720 ILCS 5/3-4(b)(1) (West 2016)) "addresses the consequences of failing to comply with compulsory joinder under section 3-3." *Quigley*, 183 Ill. 2d at 11. The statute provides, in relevant part, that a prosecution is barred if the defendant was formerly prosecuted for a different offense if the former prosecution resulted in either a conviction or an acquittal and the subsequent prosecution "was for an offense with which the defendant should have been charged on the former prosecution, as provided in Section 3-3 of this [Criminal] Code." 720 ILCS 5/3-4(b)(1) (West 2016). Whether charges are subject to compulsory joinder is an issue of law and thus subject to *de novo* review where, as here, the relevant facts are not disputed. See *People v. McGee*, 2015 IL App (1st) 130367, ¶ 28.

¶ 58    Our analysis begins with the supreme court's decision in *Jackson*, 118 Ill. 2d at 192, *overruled on other grounds by Stefan*, 146 Ill. 2d 324. There, the defendant was the driver in a single-car accident in which the passenger was killed. *Id.* at 183. The defendant was issued uniform traffic complaint citations for driving under the influence (DUI) and illegal transportation of alcohol. *Id.* The defendant pled guilty to the charges three days later. *Id.* Prior to sentencing, however, the trial court granted the State's motion to nol-pros both charges. *Id.* The defendant was

subsequently indicted on two counts of reckless homicide. *Id.* Count I alleged reckless swerving of the car resulting in striking a tree and causing the passenger's death, and count II alleged that the defendant's reckless act was the DUI. *Id.* The trial court granted the defendant's motion to dismiss count II on double jeopardy grounds and ruled that the State could not use the evidence of the DUI or illegal transportation of alcohol on the remaining count. *Id.* The appellate court affirmed. *Id.*

¶ 59    The supreme court reversed, holding that the defendant was placed in jeopardy on the DUI and illegal-transportation-of-alcohol charges, even though the charges were nol-prossed, but that DUI was not a lesser included offense of reckless homicide for double jeopardy purposes. *Id.* at 188-92. The court proceeded to address the argument that the compulsory-joinder statute barred prosecution for the reckless homicide charges. *Id.* at 192-93. Rejecting the "underlying assumption in the argument that a charge in a traffic ticket is the type of offense referred to in our compulsory-joinder statute," the court pronounced: "We hold today that the compulsory-joinder provisions of section 3-3 do not apply to offenses that have been charged by the use of a uniform citation and complaint form provided for traffic offenses." *Id.* at 192. The uniform citation and complaint forms cannot be used to charge a felony. *Id.* Rather, the forms "are intended to be used by a police officer in making a charge for traffic offenses and certain misdemeanors and petty offenses." *Id.* While section 3-3 was intended to "curtail abuses of prosecutorial discretion," the legislature did not intend "that a driver could plead guilty to a traffic offense on a traffic ticket issued by a police officer and thereby avoid prosecution of a serious offense brought by the State's Attorney, such as reckless homicide, through the use of sections 3-3 and 3-4 of the Criminal Code." *Id.* at 193.

¶ 60    Similar to *Jackson*, the State notes, here, defendant was charged with failure to reduce speed to avoid an accident by way of a uniform citation and complaint form. Thus, the State argues,

the subsequent charges for aggravated unlawful use of an electronic communications device were not subject to compulsory joinder. Defendant acknowledges *Jackson* but urges a more nuanced analysis, arguing that this court, in *People v. Thomas*, 2014 IL App (2d) 130660, rejected a mechanical application of *Jackson*.

¶ 61    In *Thomas*, the arresting officer initially charged the defendant with two traffic offenses and one misdemeanor DUI charge pursuant to section 11-501(a)(2) of the Vehicle Code (625 ILCS 5/11-501(a)(2) (West 2010) (impairment)). *Thomas*, 2014 IL App (2d) 130660, ¶ 3. The State subsequently charged the defendant, by information, with a second misdemeanor DUI pursuant to section 11-501(a)(1) of the Vehicle Code (625 ILCS 5/11-501(a)(1) (West 2010) (blood alcohol content of 0.08 or more)). *Thomas*, 2014 IL App (2d) 130660, ¶ 6. The trial court dismissed the second DUI charge, finding that it was subject to compulsory joinder with the first DUI charge and that the delay in bringing the charge violated the defendant's statutory right to a speedy trial. *Id.* ¶ 7.

¶ 62    On appeal, the State argued that, under *Jackson*, the subsequent DUI charge was not subject to compulsory joinder, because the initial DUI charge was filed by a police officer by way of a uniform traffic citation and complaint. *Id.* ¶ 16. In rejecting the State's argument, we reasoned that the court in *Jackson* was primarily concerned with the possibility that a defendant could avoid prosecution for a later-charged felony by pleading guilty to the earlier-filed lesser offense. See *id.* ¶¶ 20-22 (citing *People v. Kazenko*, 2012 IL App (3d) 110529, ¶ 22 (Schmidt, P.J., specially concurring) ("[w]hile a felony is not subject to compulsory joinder with a charge made by a uniform citation" under *Jackson*, a misdemeanor DUI charge "may well be subject to compulsory joinder" with an almost identical earlier-filed misdemeanor DUI charged by uniform citation)).

¶ 63    We proceeded to discuss the critical distinctions between the facts in *Thomas* and the facts in *Jackson*. *Id.* ¶ 21. Initially, we noted that the original misdemeanor DUI charge in *Thomas* was not in fact brought by a uniform traffic citation and complaint like in *Jackson*. *Id.* ¶ 17. Rather, the original DUI charge was brought through a verified complaint, and the State later attempted to "add another misdemeanor charge, based on the same incident, on the eve of trial." *Id.* ¶ 21. We explained that *Thomas* did *not* involve (1) "charges brought via traffic tickets," (2) "a defendant pleading to traffic offenses," or (3) "the subsequent filing of felony charges based on the same incident." *Id.* Thus, "[t]he danger that the supreme court sought to avoid in its ruling in *Jackson*," that the defendant could plead guilty to a traffic offense and avoid prosecution for a felony, "simply [was] not present." *Id.*

¶ 64    We further rejected the State's argument that the information necessary to charge the defendant with the second DUI (blood alcohol content of 0.08 or more) was not available to the State at the time of the initial charge. *Id.* ¶¶ 23-25. Although the State did not receive the results of a blood analysis until approximately six months after the initial charge, the record established that the police officer learned the defendant's blood-serum blood alcohol content from an emergency room nurse on the night of the defendant's arrest, calculated the defendant's actual level of blood alcohol to be 0.134, and included this information in his reports. *Id.* Accordingly, we held that compulsory joinder applied to the charges. *Id.* ¶ 30.

¶ 65    We note that the Appellate Court, Third District, subsequently held, citing our analysis in *Thomas*, that compulsory joinder may apply to misdemeanor charges that are initially filed by a police officer. *People v. Rogers*, 2020 IL App (3d) 180088, ¶ 26, *appeal allowed*, No. 126163 (Ill. Sept. 30, 2020). Neither party cites *Rogers*. We highlight that our supreme court allowed the State's petition for leave to appeal in *Rogers* on September 30, 2020.

¶ 66    Notwithstanding *Thomas* and *Rogers*, *Jackson* controls our holding here. The bases upon which *Jackson* was distinguished in *Thomas* and *Rogers* are simply not present in this case. First, the traffic citation for failure to reduce speed to avoid an accident that Nelson issued to defendant on the day of the collision was brought by a uniform citation and complaint form. Second, defendant pled guilty to the traffic citation. Third, the subsequent charges were for both misdemeanor and felony aggravated unlawful use of an electronic communication device in violation of section 12-610.2(b-5) of the Vehicle Code. Specifically, the initial information charged two counts of felony aggravated unlawful use of an electronic communication device. The charges were superseded by indictment for a felony violation of the statute based upon Ashley's death, and the State filed a criminal complaint against defendant for a misdemeanor violation of the statute based upon great bodily harm to Martinez. See 625 ILCS 5/12-610.2(e) (West 2016) ("A person convicted of violating subsection (b-5) commits a Class A misdemeanor if the violation resulted in great bodily harm, permanent disability, or disfigurement to another. A person convicted of violating subsection (b-5) commits a Class 4 felony if the violation resulted in the death of another person."). Accordingly, the very danger present in *Jackson*—that defendant could plead guilty to a traffic offense and avoid felony prosecution—persisted here.

¶ 67    Moreover, to the extent defendant maintains that the misdemeanor aggravated-unlawful-use-of-an-electronic-communication-device charge was nonetheless subject to compulsory joinder, the argument is unpersuasive. Compulsory joinder requires, at a minimum, knowledge of the possibility of additional charges when the defendant is initially charged. *Thomas*, 2014 IL App (2d) 130660, ¶ 24 (citing *People v. Dismuke*, 2013 IL App (2d) 120925, ¶ 22)); see also *People v. Luciano*, 2013 IL App (2d) 110792, ¶ 78 ("for purposes of section 3-3, 'knowledge' or 'known to the proper prosecuting officer' means the conscious awareness of evidence that is sufficient to give

the State a reasonable chance to secure a conviction"). Defendant provided his cell phone to Nelson at the hospital on the day of the collision, but that did not provide the requisite knowledge—defendant had deleted the relevant text messages. The charging officer had neither the Cellebrite report nor the accident reconstruction analysis at the time failure to reduce speed was charged. Accordingly, the felony and misdemeanor aggravated-unlawful-use-of-an-electronic-communication-device charges were not subject to compulsory joinder, because the factual basis for the charges was not known to the proper prosecuting officer at the time failure to reduce speed was charged by the officer. In sum, we continue to adhere to the holding in *Jackson* and conclude that the charges for felony and misdemeanor aggravated unlawful use of an electronic communication device were not subject to compulsory joinder with the uniform citation for failure to reduce speed to avoid an accident.

¶ 68    Defendant nevertheless maintains that "*Jackson* does not support the State's use of a conviction on the original traffic charge to support the State's later felony and misdemeanor charges at trial." Defendant points out that the traffic charges in *Jackson* were nol-prossed, whereas here, defendant pled guilty and was sentenced on the traffic charge. According to defendant, unlike in *Jackson*, the State gained an unfair advantage here by introducing his failure-to -reduce-speed-to-avoid-an-accident conviction in the prosecution and relying on the conviction in closing argument.

¶ 69    However, nothing in *Jackson* limited the holding to cases in which the initial traffic charges were nol-prossed. Rather, the court stated in no uncertain terms: "We hold today that the compulsory-joinder provisions of section 3-3 do not apply to offenses that have been charged by the use of a uniform citation and complaint form provided for traffic offenses." *Jackson*, 118 Ill. 2d at 192. Moreover, the State referred to the failure-to-reduce-speed-to-avoid-an-accident

conviction merely as a basis to establish the preliminary element—that defendant was driving a motor vehicle. The record demonstrates that there was no dispute that defendant was driving the pickup truck. Accordingly, there is no basis upon which to conclude that the State gained an unfair advantage through introduction of the conviction.

¶ 70    Defendant also maintains that *Jackson* did not endorse the State's "tactic" here, which he characterizes as "accepting a guilty plea to the traffic violation at a time when it had the evidence it would use at trial on the subsequently filed felony and misdemeanor charges." Defendant analogizes this case to *People v. Smith*, 2017 IL App (1st) 161231. In *Smith*, the defendant was charged with marijuana possession; he pled guilty and was sentenced to probation. *Id.* ¶ 4. Over a year later, the defendant was charged with manufacturing counterfeit currency based upon evidence the State obtained in connection with the search that led to the marijuana-possession charge. *Id.* The appellate court affirmed the dismissal of the subsequent charge on compulsory-joinder grounds, reasoning that to hold otherwise "would permit prosecutors to impose consecutive sentences the court would not otherwise order, by waiting until the defendant served his sentence on one charge before formally seeking an indictment on other charges based on information prosecutors knew when they filed the original charges." *Id.* ¶ 15.

¶ 71    *Smith* does not impact the application of *Jackson* here. Indeed, as discussed, the evidence for aggravated unlawful use of an electronic communication device was not known to the proper prosecuting officer when the traffic ticket was issued on the day of the collision. Defendant provided his cell phone to Nelson on the day of the collision, but he had deleted the text messages at issue. The record demonstrates that the Cellebrite extraction on defendant's cell phone was conducted the following week and that the accident reconstruction analysis was conducted over the next several months. Accordingly, there is no basis upon which to hold that "the several

offenses [were] known to the proper prosecuting officer at the time of commencing the prosecution." See 720 ILCS 5/3-3(b) (West 2016); *Jackson*, 118 Ill. 2d at 192-93.

¶ 72   Defendant's argument effectively rewrites the relevant time period set forth in section 3-3(b) from "at the time of commencing the prosecution" to "at the time of accepting a guilty plea to the traffic violation." His argument also fails to appreciate that, while the Cellebrite extraction had been conducted before defendant pled guilty on January 25, 2017, the record demonstrates that completion of an accident reconstruction report usually takes about six months and that, here, McMahon received the report on June 20, 2017—several months after defendant pled guilty. In sum, the charges for aggravated unlawful use of an electronic communication device were not subject to compulsory joinder with the traffic citation for failure to reduce speed.

¶ 73                              B. Sufficiency of the Evidence

¶ 74   Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of felony and misdemeanor aggravated unlawful use of an electronic communication device. We disagree and hold that the State presented sufficient evidence upon which the trial court reasonably could conclude that defendant was guilty of the offenses.

¶ 75   The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court faced with a challenge to the sufficiency of the evidence must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The same standard for reviewing the sufficiency of the evidence applies to both jury trials and bench trials. *People v. Howery*, 178 Ill. 2d 1, 38 (1997). The reviewing court's role is not to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the

evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it leaves reasonable doubt of the defendant's guilt. *Id.*

¶ 76    Considering the evidence in the light most favorable to the prosecution, we conclude that the record demonstrates sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt the essential elements of felony and misdemeanor aggravated unlawful use of an electronic communication device. At the time of the offenses here, section 12-610.2(b) of the Vehicle Code provided that "[a] person may not operate a motor vehicle on a roadway while using an electronic communication device." 625 ILCS 5/12-610.2(b) (West 2016). The offense is elevated to aggravated unlawful use of an electronic communication device when the defendant "violates subsection (b) and in committing the violation he *** was involved in a motor vehicle accident that results in great bodily harm, permanent disability, disfigurement, or death to another and the violation was a proximate cause of the injury or death." *Id.* § 12-610.2(b-5). If great bodily harm, permanent disability, or disfigurement results from the violation, the offense is a Class A misdemeanor, and, if death results, the offense is a Class 4 felony. *Id.* § 12-610.2(e).

¶ 77    Defendant argues that the State failed to present sufficient evidence that his use of an electronic communication device caused Ashley's death and Martinez's injuries. "The concept of proximate cause encompasses two separate requirements, cause in fact and legal cause," *i.e.*, foreseeability. *People v. Swift*, 2016 IL App (3d) 140604, ¶ 50 (citing *People v. Hudson*, 222 Ill. 2d 392, 401 (2006)). Defendant does not contest the general foreseeability of a collision and resulting injuries from the use of a cell phone while driving. See *id.* ¶ 52 (explaining that a rational

trier of fact could conclude "that when a driver takes his eyes off the road, whether to stare into a cornfield, or to pick up sandwiches, it is foreseeable that a traffic accident might occur"). Rather, his argument is that there was a reasonable doubt that he was in fact using his cell phone at the time of the collision. We review the evidence regarding the timeline of events occurring before and after the collision.

¶ 78    Martinez testified that, after she and Ashley picked up Angela from work on Boombah Way just before 3 p.m., they proceeded to drive north on Route 47. According to Nelson, the intersection of Route 47 and Boombah Way is "[l]ess than half a mile" from the intersection of Route 47 and Corneils Road. Martinez testified that she used her turn signal and waited one to two minutes as she prepared to turn left onto Corneils Road from Route 47. Angela testified that Martinez was pointing out the Corneils Road sign before she heard the crash.

¶ 79    The Cellebrite extraction performed on defendant's cell phone recovered a 10-message text conversation between defendant and Daniels beginning at 2:58:15 p.m. and ending at 3:01:55 p.m. The last text message defendant sent was at 3:01:51 p.m.; Daniels responded at 3:01:55 p.m.

¶ 80    The parties stipulated that the first 911 call came in at 3:03:18 p.m. from a caller named Miles, who had not witnessed the crash. On the recorded call, Miles stated that he missed the crash by "about a minute" and that there were "about 10 people" helping at the scene. In addition, Romero, the southbound driver whose windshield was broken from the falling debris, testified that she exited her car and proceeded toward the scene. She stated that two other people had stopped— a man and a woman. Romero testified that "[m]aybe a minute or two minutes maximum" passed between when the debris hit her car and when she first "heard" someone calling 911. However, she also testified that she "saw" that the woman who had stopped was dialing 911. She did not

know whether it was the man or the woman who first called 911. Nelson testified that he was dispatched to the scene at about 3:03 p.m.

¶ 81    In weighing all of this evidence, the trial court reasonably could have concluded that the collision occurred no later than 3:02:18 p.m.—"about a minute" before the first 911 call (and possibly earlier, 3:01:18 p.m., if Miles's 911 call was the 911 call to which Romero referred as having occurred "[m]aybe a minute or two minutes maximum" after the debris hit her car). That left, at most, a window of 27 seconds after defendant sent his last text message at 3:01:51 p.m., and 23 seconds after Daniels sent her last text message at 3:01:55 p.m., before the collision occurred. During the less than 4-minute time period leading up to this window, defendant and Daniels had exchanged 10 text messages (5 messages from defendant and 5 messages from Daniels), averaging a message approximately every 24 seconds. Specifically, defendant's response time to Daniels's text messages ranged from 10 seconds, to 19 seconds, to 32 seconds (and then 2 seconds and 20 seconds in texts from defendant without an intervening text from Daniels). Accordingly, it was reasonable to infer that defendant continued to read Daniels's most recent text message in the ongoing conversation, just as he had been doing during the previous four minutes, and that the use of his cell phone was a proximate cause of the resulting death and injuries.

¶ 82    The content of the text-message conversation further supported a reasonable inference that defendant's reading of Daniels's text messages was a proximate cause of the death and injuries. Indeed, in their intimate discussion over text, defendant told Daniels: "Write it down as soon as possible." A "trier of fact is not required to disregard the inferences that normally flow from the evidence." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11.

¶ 83    Defendant, however, contends that such an inference was unreasonable, citing *People v. Casciaro*, 2015 IL App (2d) 131291. There, we explained the analytical framework and underlying

considerations in resolving whether an inference is reasonable. See *id.* ¶ 89. "An inference is a factual conclusion that can rationally be drawn by considering other facts. [Citation.] Due process protects a defendant against conviction except upon proof beyond a reasonable doubt of 'every fact necessary to constitute the crime with which the defendant is charged.' [Citation.]" *Id.* An inference satisfies due process where "(1) there is a rational connection between the basic fact and the presumed fact; (2) the presumed fact more likely than not flows from the basic fact; and (3) the inference is supported by corroborating evidence of guilt." *Id.*

¶ 84    Distilled, defendant's argument challenges what he posits was the "basic fact"—the precise timing of the text-message conversation. He contends that the State was required to prove that "the extracted data are accurate to the second and synchronized with the timing system used for the 911 call." In support, defendant cites in his opening brief an article from the "iGeeksBlog" for the proposition that "[a]n IPhone can have bugs that distort its functioning. Incorrect times have at times been experienced." In his reply brief, he cites an article purportedly by a cell phone forensic technician discussing what defendant describes as "this timing problem." We disregard these articles, as they pertain to matters outside the record. The proposition for which they are cited was never argued or presented to the trial court and lacks any evidentiary support in the record. See *Keener v. City of Herrin*, 235 Ill. 2d 338, 346 (2009); *People v. Boykin*, 2013 IL App (1st) 112696, ¶ 9.

¶ 85    Defendant nevertheless contends that an expert witness was required to testify to the accuracy of the text-message transcript. Defendant never raised this objection at trial or in his posttrial motion and has therefore forfeited the argument. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant also acknowledges, citing several decisions from other jurisdictions, that "[c]ourts have held that lay witnesses such as police officers may testify about their use of the

Cellebrite device to extract information from a cellular telephone." Ultimately, defendant's argument is that McMahon's qualifications to testify regarding the data extracted from defendant's cell phone "are questionable" because the record demonstrated that it was McMahon's first time utilizing Cellebrite along with Mikolasek and McMahon may not have personally performed the extraction. Again, defendant never raised this objection at trial or in his posttrial motion and therefore has forfeited the argument. See *id.* Defendant's characterization of McMahon's testimony is also not complete. Defendant cites a portion of McMahon's testimony from the evidentiary hearing on the motion to dismiss, but McMahon testified at trial that Mikolasek "walked me through how to use the device," at which time "we performed the extraction on the defendant's cell phone" by connecting the phone to the Cellebrite device and following the prompts. At trial, McMahon further explained his collaboration with Mikolasek on the Cellebrite extraction: "We were sitting right next to each other while he was explaining to me how the process is done and how you use the machine. So I was right there. I don't recall who completed it. But we were right there together." Accordingly, defendant's arguments with respect to purported deficiencies in the data from the Cellebrite extraction report are unpersuasive.

¶ 86 Moreover, defendant's arguments ignore that Daniels's testimony corroborated the accuracy of the text-message transcript extracted from defendant's cell phone. Daniels testified that she and defendant engaged in a text-message conversation that began shortly before 3 p.m. on the day of the collision and lasted several minutes. As such, we cannot say that it was unreasonable for the trial court to conclude that defendant's use of his cell phone was a proximate cause of Ashley's death and Martinez's injuries.

¶ 87 Defendant notes that the indictment, as drafted by the State, accused him of "operat[ing] a motor vehicle while using an electronic communication device to *read* an electronic message."

(Emphasis added.) He then notes that McMahon testified that the Cellebrite report reflected only *that* the text messages were read, not *when* the text messages were read. Of course, the text-message conversation itself reflects defendant's consistent responses to Daniels's texts. A reasonable inference from the nature and timing of his responses was that defendant in fact read the text messages before responding. Defendant does not articulate any argument otherwise. That brings us again to the last two text messages in the 10-message conversation preceding the collision—the message defendant sent at 3:01:51 p.m. and the message Daniels sent at 3:01:55 p.m. As set forth above, this left a window of 27 seconds (if calculating from the time of defendant's message) or 23 seconds (if calculating from the time of Daniels's message) before the latest the collision could have occurred (about 60 seconds before the first 911 call). Focusing on the 27-second time period, defendant argues that, "[t]o prove that [defendant] was *sending* his last text message when the accident occurred, the State needed to prove with precision that [defendant] *sent* his last text message 87 seconds before the 911 call."

¶ 88    We point out that the State was not required to prove that defendant was sending or reading a text message at the exact moment of the collision. Section 12-610.2(b) prohibits "operat[ing] a motor vehicle on a roadway while *using* an electronic communication device." (Emphasis added.) 625 ILCS 5/12-610.2(b) (West 2016). When in addition the *use* is "a proximate cause of the injury or death," the defendant is guilty of aggravated unlawful use of an electronic communication device. *Id.* § 12-610.2(b-5).

¶ 89    The legislative history of the statute is also illustrative. The initial version of the statute provided that "[a] person may not operate a motor vehicle on a roadway while using an electronic communication device to compose, send, or read an electronic message." See 625 ILCS 5/12-610.2(b) (West 2010). As technology advanced, the statute was amended to delete "to compose,

send, or read an electronic message" for the purpose of "[e]xpand[ing] the prohibition on driving while using an electronic communication device to include uses *beyond* composing, sending, or reading an electronic message." (Emphasis added.) 98th Ill. Gen. Assem., House Bill 1247, 2013 Sess. Indeed, the current version of the statute provides that "[a] person may not operate a motor vehicle on a roadway while using an electronic communication device, including using an electronic communication device to watch or stream video." Pub. Act 101-297, § 5 (eff. Jan. 1, 2020) (amending 625 ILCS 5/12-610.2(b)). Accordingly, we refocus the analysis on what the State was required to prove—that defendant's use of his cell phone was a proximate cause of Ashley's death and Martinez's injuries. This of course would include the use of his cell phone to read Daniels's text messages.

¶ 90    In arguing that the State failed to meet its burden of proof, defendant likens this case to two "texting-while-driving decisions" from other jurisdictions. See *State v. Warnke*, 441 P.3d 1074 (Kan. Ct. App. 2019); *Lee v. Croskey*, Nos. 313217, 313218, 2015 WL 1814033 (Mich. Ct. App. Apr. 21, 2015) (unpublished opinion). Initially, we note that decisions from other jurisdictions are not binding on this court (see *Kostal v. Pinkus Dermatopathology Laboratory, P.C.*, 357 Ill. App. 3d 381, 395 (2005)), particularly where a decision is unpublished, as is *Lee* (see *Illinois State Toll Highway Authority v. Amoco Oil Co.*, 336 Ill. App. 3d 300, 317 (2003)). A close review of the cases demonstrates that they do not offer a persuasive basis for defendant's position in any event.

¶ 91    In *Warnke*, 441 P.3d at 1081, the court reasoned that a 46-second phone call that the defendant placed on her cell phone had to have occurred after the last text message on her phone and before the accident. Otherwise, if the accident happened while the defendant was reading the text message, the phone call never would have occurred. *Id.* Since it was not unlawful to use a cell phone to make a phone call while operating a motor vehicle, the defendant's convictions were

reversed. *Id.* at 1084. *Warnke* is inapposite. There was no evidence that defendant was on a phone call at the time of the collision.

¶ 92    In *Lee*, 2015 WL 1814033, at *5, the evidence established that the defendant driver sent a text message at 12:46 p.m. and received a text message at 12:47 p.m. The evidence also established that the accident occurred at either 12:48 p.m. or 12:55 p.m. *Id.* Since the defendant could have sent the 12:46 p.m. message well before the accident and there was no evidence that the defendant read the 12:47 p.m. text message, the defendant driver was entitled to summary judgment on the plaintiff's claim that the defendant was grossly negligent in causing an accident by texting while driving. *Id.*

¶ 93    In contrast, here, the evidence demonstrated that defendant and Daniels were engaged in a fluid text-messaging conversation between 2:58:15 p.m. and 3:01:55 p.m. They exchanged 10 messages in a 4-minute time period. Daniels described the text-message conversation as constant. According to Daniels, every time she sent a text message, defendant replied. The Cellebrite extraction report reflects defendant's responses to the text messages. Accordingly, a reasonable inference was that defendant's use of his cell phone in the ongoing text-message conversation was a proximate cause of the death and injuries in this case.

¶ 94    Defendant maintains that the inference is not supported by corroborating evidence of guilt. Rather, defendant argues, "there is evidence that [defendant] told the police immediately after the accident that he was looking at his clipboard when the accident occurred." In support of this statement, defendant cites the transcript from his guilty-plea hearing on the failure-to-reduce-speed charge, during which the assistant state's attorney stated, in response to the trial court's question as to the manner in which the accident occurred, his belief that defendant was working at the time

and indicated that he was looking down at a clipboard. Defense counsel at the guilty-plea hearing added that defendant was "just momentarily distracted" and "[l]ocked up the brakes."

¶ 95    However, no such evidence was introduced at trial. The only mentions of the clipboard at trial were Helm's testimony that he removed the company clipboard from the pickup truck after the collision and McMahon's testimony that he told Vanko that the driver of the pickup truck may have been using an electronic communication device or looking for a clipboard at the time of the crash. Moreover, the expert testimony regarding the accident reconstruction analysis refutes the suggestion that defendant was momentarily distracted at the time of the collision. To the contrary, Vanko's testimony demonstrated that defendant was completely disengaged from the roadway—driving 63 to 66 miles per hour at impact with no evidence of any preimpact braking.

¶ 96    In addition, although the trial court found that the State established defendant's guilt even without consideration of defendant's actions after the accident, we note that the State presented persuasive evidence of consciousness of guilt. Although similarly not dispositive in our determination, the evidence demonstrated that defendant deleted the incriminating text-message exchange with Daniels from his cell phone before he provided it to the police. See *People v. Abernathy*, 402 Ill. App. 3d 736, 753 (2010) (" 'Evidence that the accused has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt.' " (quoting *People v. Spaulding*, 309 Ill. 292, 306 (1923))). Also, later, on the evening of the collision, defendant, through a "spam account," directed Daniels not to use his name or "call, text or snap [his] phone." He advised that he was in "a very bad accident" that would "cause lots of legal troubles" and instructed her not to "tell a soul." This evidence clearly exhibited defendant's consciousness of guilt as to his use of his cell phone in causing the collision. Accordingly, viewing this and all the other evidence in the light most favorable to the State, we cannot say that the

evidence was so unreasonable, improbable, or unsatisfactory that it leaves a reasonable doubt of defendant's guilt.

¶ 97     As a final matter, defendant argues that the trial court erroneously admitted the Snapchat videos, because the videos were irrelevant to whether he was using his cell phone at the time of the collision. He points out that the videos were created between 9:54 a.m. and, at the latest, 2:06 p.m.—nearly one hour before the 911 call reporting the collision—and thus "in no way eliminated the reasonable doubt undermining the State's case."

¶ 98     The trial court relied upon *Morales*, 2012 IL App (1st) 101911, in admitting the Snapchat videos. In *Morales*, the defendant and several codefendants were convicted of murder and robbery after beating the victim to death. *Id.* ¶ 1. The court held that evidence of the defendant's participation in a similar beating of a different victim at the same location three weeks earlier was properly admitted to show that the earlier beating led to the charged beating. *Id.* ¶¶ 28-30. "[I]f the prior crime is part of the 'course of conduct' leading up to the crime charged, then it constitutes intrinsic evidence of the charged offense and its admissibility is not analyzed as 'other crimes' evidence ***." *Id.* ¶ 25. In other words, there, the first beating provided an explanation for the murder and was part of the "context" of the second beating. *Id.* ¶ 34.

¶ 99     Even if the videos were improperly admitted, considering the entirety of the record, any error in their admission was harmless. As discussed, there was ample evidence from which the trier of fact could have found that defendant's use of his cell phone proximately caused Ashley's death and Martinez's injuries in this case. This included the text-message conversation between defendant and Daniels that was recovered from defendant's cell phone during the Cellebrite extraction process. The State also introduced expert testimony from Vanko that defendant's pickup truck was traveling at the speed of 63 to 66 miles per hour at the time of impact and that there was

no evidence of preimpact braking by the truck. Accordingly, we cannot say that there is a reasonable probability that, if the evidence had been excluded, the outcome would have been different. See *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 83. Thus, any alleged error in the admission of the videos was harmless. Considering all of the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of aggravated unlawful use of an electronic communication device beyond a reasonable doubt.

¶ 100                                                III. CONCLUSION

¶ 101    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 102    Affirmed.

---

**No. 2-19-0271**

---

| | |
|---|---|
| **Cite as:** | *People v. Delhaye*, 2021 IL App (2d) 190271 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 17-CF-204; the Hon. Robert P. Pilmer, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James T. Malysiak, of Jenner & Block LLP, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric C. Weis, State's Attorney, of Yorkville (Patrick Delfino, Edward R. Psenicka, and Steven A. Rodgers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---