2023 IL App (2d) 220091
No. 2-22-0091
Opinion filed April 7, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of McHenry County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-597 |
| | ) | |
| KEITH L. LANG, | ) | Honorable |
| | ) | Robert A. Wilbrandt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Jorgensen and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, defendant, Keith L. Lang, was found guilty of drug-induced homicide (720 ILCS 5/9-3.3(a) (West 2020)) and sentenced to 10 years in prison. On appeal, defendant claims that either the charges should have been dismissed or he should receive a new trial. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    On September 22, 2017, Scott Koivisto, 23, was found by his mother in his bedroom at their home in unincorporated McHenry. There was evidence of intravenous drug use around his room and on his body. Paramedics could not revive Koivisto, and he was declared dead at the

scene. A pathologist determined that the adverse effects of heroin and fentanyl consumption killed Koivisto.

¶ 4 An investigation revealed that Koivisto had obtained several bags of heroin from Elizabeth Long. The sheriff's office obtained a search warrant for Long's phone, which revealed that she had arranged to purchase heroin from defendant.

¶ 5 Long testified under a plea agreement that she had been a daily heroin user. She occasionally sold heroin to support her habit, and she and Koivisto had been friends since high school. She and Koivisto also had used heroin together. Long explained that, on September 21, 2017, she picked up Koivisto from his house in McHenry, and they went to defendant's apartment in Crystal Lake to get heroin. Long knew defendant, and Koivisto did not, so she picked up the heroin for Koivisto. On cross-examination, Long stated that, before Koivisto's death, she went to Chicago "[m]aybe two or three [times]" each week to buy heroin. On redirect examination, Long clarified that the heroin she picked up that night and gave to Koivisto came from defendant.

¶ 6 Through an expert witness, the State introduced cell phone records and cell-site data, which corroborated Long's testimony. That evidence showed that, on September 21, 2017, Koivisto's and Long's cellular phones traveled from the specific areas associated with Koivisto's home in McHenry to defendant's apartment in Crystal Lake and back, just as Long had testified.

¶ 7 After the State rested and the court declined to direct the verdict for defendant, defense counsel stated that he had planned to call John Neveitt as a witness. But, counsel stated, because he had not asked Long "the predicate question," he "can't bring John to testify as to a prior inconsistent statement." With that, defendant declined to testify, and the defense rested. As noted, the jury found defendant guilty of drug-induced homicide.

¶ 8    Before sentencing, defendant hired new attorneys and filed several posttrial motions against the verdict. One motion sought to arrest the judgment and dismiss the charges due to grand jury misconduct. In summary, the motion noted that the lead detective testified that a pathologist determined that Koivisto died from the adverse effects of consuming heroin and fentanyl. The motion asserted that testimony was "intentionally misleading" because Koivisto's death certificate stated that the manner of death was " 'accident.' " The trial court found the testimony was neither misleading nor inconsistent with the charge of drug-induced homicide and denied the motion.

¶ 9    Defendant's motion for new trial largely alleged ineffective assistance by trial counsel William Bligh. The motion alleged that trial counsel was ineffective for failing to (1) impeach Long with Neveitt's testimony, (2) impeach Long with her proffered statement that she went to Chicago "everyday" [*sic*] to get heroin, (3) retain and present testimony from a "digital forensics expert" to rebut the State's geolocation evidence, and (4) object to Koivisto's mother's testimony that her son was addicted to drugs because it was irrelevant to her testimony that her son had been alive (also known as life-in-being evidence).

¶ 10    At a hearing on the motion, trial counsel again testified that he "inadvertently" failed to ask Long "the question" that counsel believed would have enabled him to call Neveitt as a witness to impeach Long's testimony about where she got the heroin from on the night in question. Counsel further stated that he did not have Long under subpoena, but the State did, so counsel believed he could not recall Long as a witness for the defense. Trial counsel also testified that he did not recall conversing with defendant about retaining an expert on geolocation evidence. Then, Neveitt testified that in October 2018—more than a year after Koivisto had died—he received a phone call from Long while she was in jail. At the time, Neveitt was in Wonder Lake with a mutual acquaintance, Shea Conrad. According to Neveitt, Long told him on the phone that the heroin she

delivered to Koivisto came from Conrad, not defendant. Neveitt then stated that Conrad also told him that he was the one who sold Long the heroin that killed Koivisto and was worried that he, too, would be charged. Conrad passed away after Koivisto's death but before the posttrial hearing.

¶ 11    The trial court found the posttrial evidence unconvincing and denied the motions. As noted, the court sentenced defendant to 10 years' imprisonment, and this appeal followed.

¶ 12                                II. ANALYSIS

¶ 13    On appeal, defendant raises the same issues that were brought up in his posttrial motions, namely improper testimony before the grand jury and ineffective assistance of trial counsel. The State asserts that none of the alleged errors altered the result of defendant's trial or amounted to a denial of due process. For the reasons that follow, we affirm.

¶ 14    We begin with defendant's primary argument, which concerns the grand jury. Again, defendant asserts that the State "intentionally misle[d]" the grand jury by failing to elicit testimony that the coroner determined that Koivisto's manner of death was accidental and "mislead [*sic*] the grand jury by not submitting the death certificate," which in turn denied defendant due process. We agree with the trial court that defendant's argument is frivolous.

¶ 15    Generally, challenges to grand jury proceedings are quite limited. *People v. Wright*, 2017 IL 119561, ¶ 61. "It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *United States v. Williams*, 504 U.S. 36, 51 (1992). The role of the State in grand jury proceedings is to inform the grand jury of the proposed criminal charges and the applicable law. *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. In turn, the grand jury's role is to determine whether probable cause exists that the subject of the proceedings has committed a crime, thus warranting a trial. *Id.* As such, grand jury proceedings are not mini-

trials, and the State is not bound by the technical evidentiary rules and procedures applicable to a criminal trial. *People v. J.H.*, 136 Ill. 2d 1, 10 (1990). For instance, the State may present hearsay evidence to the grand jurors (so long as it is clearly presented as hearsay), and the State has no duty to disclose exculpatory evidence during grand jury proceedings. See *Williams*, 504 U.S. 36, 48-52; *Costello v. United States*, 350 U.S. 359, 364 (1956); *DiVincenzo*, 183 Ill. 2d at 257-58; *People v. Holmes*, 397 Ill. App. 3d 737, 742 (2010); *People v. Oliver*, 368 Ill. App. 3d 690, 696-98 (2006); *People v. Torres*, 245 Ill. App. 3d 297, 301 (1993).

¶ 16    In all respects, however, the defendant bears the burden of showing that any misconduct before the grand jury deprived him of due process and that his resulting indictment constituted a miscarriage of justice. *Wright*, 2017 IL 119561, ¶ 61. Here, defendant cannot overcome that burden. Even if we could somehow label the coroner's determination that Koivisto's death was accidental as exculpatory evidence in defendant's favor, the foregoing cases make it *abundantly* clear that the State was under no obligation to present that finding to the grand jury.

¶ 17    More importantly though, there was truly nothing inconsistent in the coroner's determination and the State's presentation of evidence before the grand jury. The offense of drug-induced homicide has two elements: (1) that the defendant knowingly, unlawfully delivered a controlled substance and (2) that ingesting that substance was a contributing cause of the victim's death. 720 ILCS 5/9-3.3(a) (West 2018); see *People v. Nere*, 2018 IL 122566, ¶¶ 29-62; *People v. Kidd*, 2013 IL App (2d) 120088, ¶¶ 32-34; *People v. Boand*, 362 Ill. App. 3d 106, 138-40 (2005). Whether a coroner determines that the victim's overdose was accidental or intentional is fully beside the point. Even if the victim intended to kill him or herself, it would not negate the elements that comprise the charge. Accidental deaths can still be homicides, and defendant can cite no relevant authority to the contrary. Defendant's argument is nothing more than a repudiation of the

drug-induced homicide statute, which has no basis in law or fact. *Cf. Faircloth v. Sternes*, 367 Ill. App. 3d 123, 126-29 (2006) (upholding the statute's constitutionality).

¶ 18     At oral argument, defense counsel emphasized that the county coroner is a constitutional officer (Ill. Const. 1970, art. VII, § 4(c)), whose duties are prescribed by statute (55 ILCS 5/3-3007 (West 2020)), and that the coroner may act as the county's sheriff when the sheriff is otherwise compromised or indisposed (*id.* § 3-3008). These observations, while true, shed no light on the issue of whether (much less compel the conclusion that) *the State* is *required* to disclose the coroner's manner-of-death findings to the grand jury in order to secure an indictment that complies with due process. Similarly, counsel mistakenly relies on *Rodik v. Ezike*, 2021 IL App (1st) 200550-U, an unpublished decision, in which the appellate court affirmed the *denial* of a writ of *mandamus* to force the Cook County Medical Examiner to reclassify an overdose death from "accident" to "homicide." If anything, *Rodik* clearly supports our holding here: that "[t]he classification of the manner of the decedent's death as either accident, suicide, or homicide" on the decedent's death certificate is a discretionary act left to the coroner or the medical examiner "informed by the facts surrounding the death and the [certificate's] author's judgment, education, and experience." *Id.* ¶ 12. Whether in a death certificate or otherwise, that finding is neither coextensive nor coterminous with *the State's* ability to hold an individual to criminal account for the death in question.

¶ 19     Like the trial court, we determine that nothing was misleading or deceptive about the State's grand jury evidence. Simply put, the coroner's accidental-death finding would not have impacted the grand jury's probable cause finding. Even if the death certificate had been introduced, there is no reasonable probability that defendant would not have been indicted. Therefore, the trial court correctly denied defendant's posttrial motion to arrest judgment and dismiss the charges.

¶ 20    The same holds true for the trial court's findings on defendant's posttrial motions based on ineffective assistance of counsel. See generally *People v. Krankel*, 102 Ill. 2d 181 (1984). The state and federal constitutions guarantee a criminal defendant the right to counsel's effective assistance. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Conversely, counsel was ineffective if (1) counsel's performance fell below an objective standard of reasonableness and (2) prejudice resulted, meaning that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525 (1984).

¶ 21    With respect to trial counsel, defendant's initial claim is that trial counsel should have impeached Long with her alleged statement to Neveitt and with her proffer statement to the police that she went to Chicago to obtain heroin "everyday [*sic*]." Regarding Long's statement to Neveitt, we find defendant's argument completely unavailing. Despite trial counsel's statements after the State rested and his testimony at the posttrial hearing, both trial counsel and defendant apparently assume that Long could have been impeached in this way. We are not convinced. Even if trial counsel had laid a foundation and asked the necessary "predicate question[s]" of Long, there was virtually no chance that Neveitt's testimony could have been admitted. Neveitt's statement—that Long supposedly said she purchased the heroin that killed Koivisto from Conrad—was classic hearsay (see Ill. R. Evid. 801 (eff. Oct. 15, 2015)), and defendant points to no exception that could have justified its admission. Although the State fails to point it out, there is no circumstance appearing in the record that would appear to support the admissibility of Neveitt's testimony at defendant's trial. Indeed, defendant's reference to Long having made a "prior inconsistent statement" is tendentious and misleading because *none* of the prerequisites for admissibility were satisfied. Long's alleged prior statement was not written, it was not recorded, and she did not

acknowledge that specific prior statement while she was under oath at trial. See 725 ILCS 5/115-10.1 (West 2018) (concerning substantive admissibility).

¶ 22     Trial counsel's willingness to "fall on his sword" at the posttrial hearing is *not* dispositive. Merely because counsel accepts blame for failing to introduce evidence does not suffice to make it admissible. Counsel's decisions regarding impeachment are a matter of trial strategy. See *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). As such, it was immune from attack under *Strickland* and its progeny unless it was so obviously incorrect or misguided as to amount to no strategy— and thus, defendant had no "counsel" at all—regardless of counsel's posttrial laments. See generally *People v. Custer*, 2019 IL 123339, ¶ 39. Counsel's failure to seek to admit Long's inadmissible statement certainly did not rise to the level of being professionally unreasonable.

¶ 23     But even assuming *arguendo* that Neveitt's testimony regarding Long's statement was admissible, or even Conrad's, we agree with the trial court that there was no reasonable probability that evidence would have altered the result of defendant's trial. That is, even if we could assume trial counsel's deficient performance, defendant still could not show prejudice. *Strickland*, 466 U.S. at 687. "When assessing the importance of the failure to impeach for purposes of a *Strickland* claim, '[t]he value of the potentially impeaching material must be placed in perspective.' " *Salgado*, 263 Ill. App. 3d at 247 (quoting *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989)). Here, Neveitt's testimony about *both* statements lacked basic information, such as precisely when the statements were made and why he waited so long to report them. In addition, Neveitt's numerous prior felony convictions—and the fact that he was incarcerated at the time of the posttrial hearing for residential burglary and aggravated battery—tend to cast doubt on his testimony that a person who died during the pendency of this case sold Long the heroin that night, and not defendant. But setting that aside, by his own admission, Neveitt was *not* with Koivisto or Long on September 21,

2017, and thus had no personal knowledge regarding where the heroin given to Koivisto actually came from. And, critically, none of the evidence at the posttrial hearing cut against the State's geolocation evidence showing the trip from McHenry to Crystal Lake and back, just as Long had testified. The posttrial hearing offered no evidence indicating where Conrad had lived, that cell-site data from Koivisto's and Long's phones could have placed them with Conrad rather than defendant, or that Koivisto was somehow in possession of heroin that came from Conrad *exclusively* and not defendant. *Cf. Nere*, 2018 IL 122566, ¶¶ 29-62 (holding that a specific source for a controlled substance need only be a contributing cause of death).

¶ 24     "It is the province of the trier of fact to determine the effect of a prior inconsistent statement upon the credibility of a witness, since an inconsistent extrajudicial statement does not, *per se*, destroy the probative value of that witness'[s] testimony; the trier of fact may accept the credibility of the witness notwithstanding the impeaching inconsistent statement." *People v. Young*, 133 Ill. App. 3d 886, 892 (1985). Here, the jury would "not [have been] required to disregard inferences which flow normally from the evidence" (*People v. Hall*, 194 Ill. 2d. 305, 332 (2000)), and the natural conclusion from the State's evidence was that Long and Koivisto each carried their phones with them and made the trip to a specific location in Crystal Lake to obtain heroin *from defendant* and then Long returned Koivisto to his home, where sadly he consumed it and died.

¶ 25     Defendant also asserts that trial counsel should have impeached Long, either with her recorded proffer statement or through the lead detective's testimony, that she traveled to Chicago "everyday [*sic*]" to obtain heroin during September 2017. We have examined the recording of Long's proffer and determine that defendant makes entirely too much of Long's statement by focusing on the word "everyday [*sic*]" to the exclusion of the conversation surrounding it. When Long said that she went to Chicago "everyday [*sic*]," Detective Fields then asked

"Everyday [*sic*]?" incredulously, implying that Long's statement could not reasonably have been literal. Long *then* said, "Pretty much," clarifying that she did not *literally* travel to and from Chicago *every single day* in September 2017 to obtain heroin from a source in Chicago *exclusively*. Accordingly, Long's proffered statement did not exclude the possibility that defendant was the source of the heroin that killed Koivisto. Defendant's omission of the context surrounding Long's statement speaks volumes, and it was not objectively unreasonable for trial counsel to eschew such an impossibly narrow and hyperliteral line of inquiry—particularly in light of Long's repeated, detailed, definitive statements that she purchased heroin from defendant and delivered it to Koivisto on September 21, 2017, shortly before he died. Given the strength of the State's evidence, trial counsel simply was not ineffective in that regard.

¶ 26    Next, defendant offers a vague, speculative assertion that, "had trial counsel presented a digital forensics expert," that expert would have "provid[ed] sufficient reasonable doubt, [and] an acquittal would have resulted." This argument, too, lacks merit. Defendant made no offer of proof as to who the proposed expert was and what that testimony would have been. See *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010). Further still, before this court, defendant failed to point to *any specific aspect* of the State's cell-site evidence that was susceptible to a different interpretation, let alone an interpretation that would have altered the result of his trial. Accordingly, the argument is forfeited (Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)), and it patently fails to meet the high bar that *Strickland* requires. *Id.*; *Strickland*, 466 U.S. at 688-89.

¶ 27    In addition, apart from his ineffective-assistance claim, defendant also argues that the trial court erred in admitting the State's cell-site evidence because the State "violated the notice provisions" in Illinois Rule of Evidence 902(11)(C) (eff. Sept. 28, 2018). We do not understand defendant's argument. Rule 902(11)(C) pertains to the self-authentication of records made during

regular business activity. It says nothing about notice. Further, defendant, as the appellant, has not provided us with any transcripts from the pretrial proceedings that might shed light on the supposed "notice" issue, so we can only conclude that the issue, if any, was properly handled by the trial court. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In any event, as the State points out, the common-law record shows that the State tendered a certification of the AT&T cell-site records on August 21, 2018, and July 7, 2020. The record includes a copy of the prosecutor's e-mail to trial counsel from July 7, 2020, explaining that, out of an abundance of caution, he felt it was necessary to obtain a new certificate because he believed the prior one was insufficient under Rule 902(11)(C). Defendant's trial then commenced on August 3, 2020.

¶ 28    Having failed to note any of this in his opening brief, defendant states in his reply brief that it is his "position" that "less than 30 days [*sic*] notice of the amended certification less than a month before trial did not give [him] ample time" to challenge the evidence "under Illinois Rules [*sic*] of Evidence 902 (11) (C) [*sic*]." He further asserts that trial counsel was ineffective for not objecting accordingly. Defendant's argument is unfounded. Rule 902(11)(C) does not contain any sort of notice provision whatsoever, and defendant cites no relevant authority on the matter; thus, the issue is forfeited. *People v. Ward*, 215 Ill. 2d 317, 332 (2005). But forfeiture aside, we can confidently say that trial counsel was not ineffective on this issue, and the trial court did not err in admitting the cell-phone records.

¶ 29    Defendant next asserts that trial counsel was ineffective for failing to object to Koivisto's mother's testimony that her son was addicted to drugs. According to defendant, this testimony was irrelevant to her identification of Koivisto as the decedent and only served to stoke the jury's passions against defendant. We disagree. As the State perceptively notes, "every mention of a deceased's family does not *ipso facto* entitle the defendant to a new trial, since in certain instances,

dependent upon the facts, such a statement can be harmless." *People v. Jordan*, 38 Ill. 2d 83, 91-92 (1967). This is a similar instance. This was a trial on the offense of drug-induced homicide, and victims in such trials typically struggle with drug addiction. Koivisto's mother's testimony did not strictly adhere to narrowly stating that her son was alive before September 21, 2017. However, in this case, the jury hearing that Koivisto was addicted to heroin was a natural, logical, and inextricable part of the story of his death. Koivisto's mother's testimony also did not dwell on the fact that he was addicted to drugs; it was only referenced once and was not part of an "emotion-laden" presentation of the State's case. *Cf.*, *e.g.*, *People v. Blue*, 189 Ill. 2d 99, 119-134 (2000). Defendant cites no authority holding that the bare mention that the decedent was a drug addict is unfairly prejudicial in a homicide case, and we decline to hold as much. Furthermore, it was not as though defendant's conviction rested in any meaningful way on the fact that Koivisto struggled with drug addiction. Thus, it was likely not error to admit Koivisto's mother's testimony, and defendant was not prejudiced by trial counsel's failure to object to it.

¶ 30    Next, defendant argues that the trial court violated his constitutional right to confront witnesses (see U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) when the court allowed the forensic pathologist, Dr. Mark Peters, to testify about the contents of a toxicology report that he did not personally prepare. That argument is also meritless.

¶ 31    At trial, Dr. Peters testified that the toxicology report informed his conclusion regarding Koivisto's cause of death, which is the type of evidence that is typically and reasonably relied on by experts in the field of forensic pathology. The report itself was *not* introduced into evidence, and Peters's testimony about its contents fell within a well-worn exception to the hearsay rule. See Ill. Rs. Evid. 703, 705 (eff. Jan. 1, 2011); *People v. Nieves*, 193 Ill. 2d 513, 528 (2000); *Wilson v.*

*Clark*, 84 Ill. 2d 186, 192-94 (1981). The same is true of the confrontation clause. See *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 32    At oral argument, defense counsel clarified that he believed it was a violation of the confrontation clause that the State's forensic toxicologist, who prepared the toxicology report, did not testify, yet Peters was allowed to testify about its contents even though someone else prepared it. Counsel reiterated that he found support in the United States Supreme Court's holding in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and that he found the State's reliance on *People v. Lovejoy*, 235 Ill. 2d 97 (2009), unpersuasive because "in that case, the conviction was reversed." These statements distort the issue before us and the holdings in both cases.

¶ 33    We begin with *Crawford*, where the Supreme Court held that it violates the confrontation clause to admit out-of-court testimonial statements of a witness, for the truth of the matter asserted, unless the witness is unavailable for trial and there was a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. The threshold inquiry for our confrontation clause analysis is a simple one. We ask, are the statements at issue "testimonial" and were they admitted to prove the truth of the matter asserted? *People v. Stechly*, 225 Ill. 2d 246, 279 (2007) (plurality opinion); *Lovejoy*, 235 Ill. 2d at 142-45.

¶ 34    Here, Dr. Peters's recitation of the toxicology report was admitted to prove the truth of the matter asserted, namely that Koivisto died from a drug overdose. More specifically, Dr. Peters explained that Koivisto died from pulmonary edema and heart failure, which, in Peters's training and experience, was consistent with the adverse effects of heroin and fentanyl consumption. Peters explained that the toxicology testing was done by an outside lab, which has the proper equipment to conduct such tests, and that he, as a forensic pathologist, routinely relies on toxicology reports

when forming an opinion on the cause and manner of the decedent's death. That testimony did not trigger the prohibition on hearsay or the confrontation clause.

¶ 35    *Melendez-Diaz* is readily distinguishable. There, the defendant was charged with cocaine distribution, and the prosecution's lone piece of forensic evidence was a "certificate" prepared by a lab analyst stating that the recovered substance was indeed cocaine. *Melendez-Diaz*, 557 U.S. at 307-09. The analyst never testified, and no other witness—and certainly no expert witness— testified that they relied on the analyst's conclusion as part of any subsequent inquiry, and the Supreme Court had little difficulty in concluding that the confrontation clause "does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits." *Id.* at 329. That was much different than the type and manner of evidence presented at this defendant's trial in this case.

¶ 36    As for our supreme court's decision in *Lovejoy*, although counsel was correct at oral argument that the defendant's conviction was reversed for a new trial, counsel failed to note that it was reversed due to a significant discovery violation by the State, which was then compounded by the trial court's inexplicable failure to grant the defense even a brief continuance to secure a witness to rebut the State's expert's surprise testimony. *Lovejoy*, 235 Ill. 2d at 110-23. The supreme court then went on to address a number of issues, including the defendant's expert witness and confrontation clause claims, as those matters were likely to arise again on remand. *Id.* at 123-53. We cannot simply dismiss the subsequent 30 pages of the *Lovejoy* opinion—one of the most comprehensive criminal-evidence decisions in our supreme court's history—as *dicta*, and even if we did, we would be no less obliged to follow it. See, *e.g.*, *People v. Hubbard*, 2012 IL App (2d) 101158, ¶ 27.

¶ 37    As *Lovejoy* and other cases have made clear, Illinois's rules of evidence "permit experts not only to consider the reports commonly relied upon by experts in their particular field, but also

to testify to the contents of the underlying records." *Lovejoy*, 235 Ill. 2d at 143 (discussing *inter alia Wilson*, 84 Ill. 2d at 192-94). Furthermore, we can readily determine that the primary purpose in preparing the toxicology report "was to identify the concentration of the tested substances in biological samples *** to determine the [victim's] cause of death." *State v. Mattox*, 2017 WI 9, ¶ 37, 373 Wis. 2d 122, 890 N.W.2d 256. As such, the toxicology report—which is to say, the testimony about its contents, as the report itself was never admitted—was categorically nontestimonial because it was not designed "to accuse 'a targeted individual of engaging in criminal conduct' " (*People v. Leach*, 2012 IL 111534, ¶ 130 (quoting *Williams v. Illinois*, 567 U.S. 50, 82 (2012)) or even necessarily to provide evidence in a criminal investigation (*id.* (citing *Davis v. Washington*, 547 U.S. 813, 822 (2006)). Accordingly, as the toxicology report was nontestimonial, defendant's confrontation rights were never at hazard.

¶ 38     Again at oral argument, defense counsel suggested that we, in essence, abandon *Wilson* and *Lovejoy*—along with Illinois Rule of Evidence 703 (eff. Jan. 1, 2011) (basis of expert's opinion testimony) and Rule 705 (eff. Jan. 1, 2011) (disclosure of facts or data underlying expert opinion)—and ignore over 40 years of development in the law of evidence. Even if we somehow could, we would decline to do so. That alternative would heedlessly plunge Illinois back into the pre-*Wilson* era and artificially limit the universe of admissible expert testimony to those who personally observed the subject in question, or needlessly compel them to testify to ponderous and complicated hypotheticals mirroring the case at hand. See, *e.g.*, *Sherman v. City of Springfield*, 77 Ill. App. 2d 195 (1966); see also Michael H. Graham, *Handbook Of Illinois Evidence* §§ 703.1, 705.1 (2020 ed.). It would also compel experts to discount or entirely omit the recorded findings and observations of the trained professionals who, though not testifying as experts at trial, nevertheless saw, heard, and engaged with the subject at issue. Just as generals rely on surveys by

forward scouts and doctors rely on nurses' charting, so, too, do forensic pathologists rely on toxicologists' reports when determining cause and manner of death. Experts wisely do not discount such observations or recollections, and neither modern hearsay prohibitions nor the confrontation clause compel courts to disregard them—especially in a trial searching for the truth. See generally *Lovejoy*, 235 Ill. 2d at 143-45. If a party wishes to challenge such evidence, it is always free to test it on cross-examination or offer its own evidence to counter it. But here we can confidently say that the confrontation clause did not prevent the jury from hearing the toxicology report evidence in the first place.

¶ 39    On a related note, defendant also asserts that Peters's testimony failed to "explain the nexus" between the toxicology results and his conclusion that Koivisto died of a drug overdose. That assertion is *not* well taken. Again, at trial, Peters explained that Koivisto died from pulmonary edema and heart failure caused by a lethal dose of heroin and fentanyl. In addition, a physical examination of Koivisto's body showed evidence of intravenous drug use, which also indicated the consumption of heroin and fentanyl. Again, the jury was not required to disregard the natural inferences that flowed from the evidence (*Hall*, 194 Ill. 2d. at 332), and particularly in light of Peters's unrebutted testimony, *any* reasonable trier of fact could have determined that Koivisto died from a drug overdose. Therefore, we categorically reject defendant's nascent challenge to the sufficiency of the State's evidence concerning the cause of Koivisto's death.

¶ 40    Last, defendant asserts that his sentence was excessive and that the trial court "improperly considered the victim's death" as a factor in aggravation during sentencing. We agree with the State that there is no basis in the record for defendant's assertion. "[T]he imposition of sentence is a matter of judicial discretion and the standard of review to determine whether a sentence is excessive is whether the trial court abused that discretion." *People v. O'Neal*, 125 Ill. 2d 291, 297-

98 (1988). We also review *de novo* whether the trial court improperly considered a factor in sentencing already inherent in the offense. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 41 We have carefully examined the sentencing record and found no impropriety. The trial court noted Koivisto's death only in passing, as it could not reasonably have omitted *all* mention of the fact that the victim had died when sentencing defendant for drug-induced *homicide*. The record reflects that the court went through each of the multiple statutory factors in aggravation and mitigation and discussed them through the context of the evidence at trial and during sentencing. The court also quite thoughtfully considered defendant's own heroin addiction as a factor in mitigation. In short, none of the court's comments were improper.

¶ 42 Regarding defendant's excessive-sentence claim, the sentencing range for drug-induced homicide, a Class X felony, is between 6 and 30 years. Defendant's 10-year sentence, thus, falls well within the bottom of that range. Also, we note that in making this argument, defendant omits any mention of his significant criminal history, which included prior convictions for unlawful delivery of a controlled substance, unlawful use of a weapon by a felon, possession of a controlled substance, and felony escape. In light of the foregoing, we cannot say that the trial court abused its discretion in imposing defendant's sentence.

¶ 43                                III. CONCLUSION

¶ 44 In sum, we reject defendant's challenges to his conviction and sentence. The evidence amply showed that (1) defendant delivered the heroin that caused Koivisto's death, (2) the grand jury was not misled, (3) defendant's trial counsel was not ineffective, (4) Dr. Peters's testimony was properly admitted, and (5) defendant's sentence was not an abuse of discretion. Therefore, we affirm the judgment of the circuit court of McHenry County.

¶ 45 Affirmed.

*People v. Lang*, **2023 IL App (2d) 220091**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of McHenry County, No. 18-CF-597; the Hon. Robert A. Wilbrandt, Judge, presiding. |
| **Attorneys for Appellant:** | Terry D. Slaw, of Law Offices of Terry D. Slaw P.C., of Buffalo Grove, and Albert L. Wysocki and Daniel A. Wysocki, of Albert L. Wysocki P.C., of Waukegan, for appellant. |
| **Attorneys for Appellee:** | Patrick D. Kenneally, State's Attorney, of Woodstock (Patrick Delfino, Edward R. Psenicka, and John G. Barrett, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |