2023 IL App (2d) 220256-U
No. 2-22-0256
Order filed June 23, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-59 |
| ERIC ALEXANDER WILLIAMS, | ) ) ) | Honorable Robert A. Wilbrandt Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was sufficient evidence to support defendant's conviction of drug-induced homicide. Affirmed.

¶ 2    Defendant Eric Alexander Williams appeals his conviction of drug-induced homicide (720 ILCS 5/9-3.3 (West 2018)). On appeal defendant challenges the sufficiency of the evidence as it relates to causation and argues that he received ineffective assistance of counsel where counsel did not take all available measures to exclude a juror whose fiancé's sister had died from a heroin overdose. For the following reasons, we affirm.

¶ 3                                              I.  BACKGROUND

¶ 4    Following a jury trial, defendant was convicted of drug-induced homicide in the December 24, 2019, death of Steffen Darnick. He was sentenced to nine years' imprisonment.

¶ 5                                A. Jury Selection

¶ 6    Jury selection took place on April 25, 2022. Per the trial court's standing order, defendant was allowed seven peremptory challenges plus one more for use against an alternate juror.

¶ 7    The first group of jurors included Mr. A., who identified himself as the McHenry County Administrator. Mr. A. indicated that he knew one of the prosecutors in the case but misidentified him. Mr. A indicated that he had friends in the state's attorney's office, but believed he could set that aside and be fair and impartial. Defendant and the State moved to strike Mr. A. for cause, which the trial court denied. Defendant then used a peremptory challenge to strike Mr. A.

¶ 8    Ms. R. was among the second group of jurors. During *voir dire* she indicated that she had family members who had been affected by drug addiction. Her daughter was a recovered addict, and her fiancé's sister had died from ingesting heroin. When asked, Ms. R. stated that she understood that the facts of each case were different, and that she could be a good juror for both sides. When it came time to determine whether Ms. R. would be placed on the jury, defendant had used all of his peremptory challenges. To which counsel stated, "I'll accept [Ms. R.] and [another prospective juror]. I have no choice." Ms. R. was ultimately empaneled as a juror. The trial then commenced, and the following evidence was adduced at trial.

¶ 9                                B. Family's Testimony

¶ 10    Aimee Jones, Steffen's mother, testified as follows: She lived in Wonder Lake with her husband, her son Dakota Tippet, Dakota's girlfriend Heather Gillessen, and their two children. Dakota, Heather, and the children lived in the basement. Steffen became addicted to marijuana in his teen years. In his twenties, he was injured and was prescribed pain medication. At some point,

the doctor took Steffen off of his pain medication, and he began using heroin. She had learned about his heroin use about a year before he died. The family tried various rehab clinics and detox facilities before sending Steffen to a rehab facility in Arizona. He went to Arizona in September 2019 and successfully completed a 90-day program.

¶ 11    Before going to Arizona, Steffen had lived in Belvidere. The plan was for Steffen to live with Jones at her home in Wonder Lake, as he was somewhat estranged from his wife, Jacqueline Darnick, at that point. Steffen had never lived at the Wonder Lake home before. On December 21, 2019, Steffen flew back to Illinois. Jones and her husband picked Steffen up from the airport. While in the car, Steffen mentioned that he had to pay off a drug debt, since in rehabilitation "they" told him to pay any outstanding debts in order to make sure his family was safe. They arrived at the house at around 1:30 a.m. Steffen's bedroom—which had previously been a spare bedroom that Jones's grandchildren would play in—was near Jones's room.

¶ 12    When they got home, Jones went through Steffen's luggage to make sure there were no drugs inside. She had also previously searched Steffen's bedroom and had not found any contraband. She testified that no other members of the household used drugs. Steffen did not have access to a vehicle, did not have a driver's license, and did not have his own bank account. Jones controlled Steffen's money. Around 11:30 a.m., Jacqueline, brought their three children over to the house. She also brought luggage and a cooler for Steffen. Jacqueline left around 2 p.m., but the children stayed overnight. Jacqueline was alone with Steffen for around 45 minutes, but Jones remained nearby, eavesdropping. When Jacqueline left Steffen was in a bad mood.

¶ 13    The next morning, on December 22, 2019, Steffen spoke with Jones about wanting to go pay a drug debt in Rockford. She drove Steffen to Rockford. His three children were also in the car. She withdrew $300 dollars from Chase Bank and gave it to Steffen to repay the debt. Between

December 21, and 24, 2019, this was the only money she gave to Steffen.

¶ 14    After the bank withdrawal, Steffen was texting with someone and directed Jones to go to a parking lot between a Wendy's restaurant and Harbor Freight tool store. He got out of the car around 1:45 p.m. and headed towards the Harbor Freight parking lot. Jones lost sight of Steffen and took the kids to Wendy's for lunch. After about ten minutes, Steffen returned to the Wendy's and said, "Hey, ma, let's go." They then packed up the kids' lunch and returned home. There were no visitors to the house on December 22, other than those who lived there.

¶ 15    On December 23, Jones, her husband, Dakota, Heather, their children, and Steffen's older two children went to a Christmas party in Belvidere. Steffen stayed home with his youngest daughter, who was around one year old. Jones did not leave any vehicles with keys at the home or leave Steffen any money. They were at the party for three to four hours. When she returned home Steffen seemed okay. He went to sleep before Jones, who went to bed around 2:30 a.m.

¶ 16    She awoke around 10 a.m. on December 24, 2019. Steffen was not yet awake. In the late morning she heard Steffen's youngest daughter crying, and after about five minutes she went to check on her. The baby had been sleeping in a crib in Steffen's room. Jones picked up the baby. She hit Steffen on his foot and he did not respond. She went to look at his face and saw that he was dead. Jones screamed for Dakota to come, and they called 911, after which police and emergency medical personnel arrived.

¶ 17    Later on February 10, 2020, Jones decided to clean out Steffen's bedroom. She discovered a box for a vape pen in the top dresser drawer. Inside the box was a folded dollar bill with powder inside of it. She called McHenry County Sheriff's Office Detective Jeff Fields who came and collected the box.

¶ 18    The folded dollar bill with powder was sent to the state crime laboratory for testing and found to contain .4 grams of heroin. Photographs of the dresser drawer, box, dollar bill, and powder were admitted into evidence and published to the jury.

¶ 19    Jacqueline Darnick testified as follows. She had been married to Steffen for almost seven years at the time of his death. During the last year of Steffen's life, he was addicted to heroin and crack cocaine. She had previously used cocaine, but stopped about eight years prior, when she learned she was pregnant with her oldest child. She had never used heroin or crack cocaine. She and Steffen were estranged due to his drug use.

¶ 20    On December 21, 2021, she brought Steffen his belongings. This included a white purse which had Steffen's marijuana paraphernalia and a cooler with medications, both of which he asked her to bring. She said she had opened the cooler, but nothing inside appeared to her as problematic. She denied bringing him any drugs.

¶ 21    When they met at Steffen's mother's house, she obligingly gave him a hug, but refused to kiss him, telling him that their relationship was not in a good place. When she left, Steffen was irritated. They had some conversations via text message over the next few days. He asked her to come over, telling her he had a surprise for her, but she declined saying she had already made plans.

¶ 22    Steffen had purchased drugs in Jacqueline's presence before. He would get a hold of someone in Rockford, and drive somewhere to meet them. She would go with him because she was concerned for his safety when he was driving. He never bought drugs anywhere other than Rockford. Steffen was a daily user of heroin and would occasionally use crack cocaine. His practice was to put the heroin in a folded dollar bill in his wallet and snort the heroin using a card. On cross-examination she denied bringing Steffen crack pipes, a Tupperware container with a

purple lid, a cardboard pipe, or any containers that contained heroin or cocaine. On redirect examination she testified that she did not know what was in the cooler or Steffen's purse. She assumed it was Steffen's bongs, bowls, and other marijuana pieces.

¶ 23 Dakota Tippet, Steffen's brother, testified as follows: At the time of Steffen's death, he was living with his girlfriend and children at his mother's home in Wonder Lake. He had recently purchased a home but was doing some renovations before moving in with his family. He first saw Steffen on the morning of December 21, 2019. Between December 21 and 24, 2019, Dakota and Steffen went to work on the new house two or three times. Dakota was with Steffen the whole time, and the only other person who came to the house was Heather. There were only three occasions when Steffen was not with Dakota: when Steffen went with his mother to Rockford on December 22, 2019, when Heather drove Steffen from Dakota's new home to their mother's house, and the Christmas party on December 23, 2019.

¶ 24 Heather testified that she gave Steffen a ride back to his mother's house from her and Dakota's new home. She testified that she did not give him any money or drugs or see him meet with anyone outside of the family.

¶ 25 C. Police Investigation

¶ 26 Officer Marco Tello, formerly of the McHenry County Sherriff's Office, testified as follows: On December 24, 2019, at approximately 11:47 a.m., Tello responded to a call of a possible overdose at 9206 Vine Avenue in Wonder Lake. When he arrived at the scene, emergency personnel were already there. He was directed to Steffen's bedroom, where he found Steffen lying on his back. His face was discolored and had blood on it. Tello believed Steffen was dead. He obtained permission from Steffen's mother to search the room. He discovered a cooler between the bed and wall. The cooler contained a bunch of empty small resealable plastic bags. Exterior

photographs of the home, interior photographs leading from the entryway to Steffen's bedroom, photographs of Steffen's bedroom, and a photograph of the cooler were admitted into evidence and published to the jury.

¶ 27    Deputy Nicholas Alejo Jr. testified as follows: On December 24, 2019, Alejo was working as a narcotics detective with the McHenry County Sheriff's Office. Alejo was tasked with collecting evidence from Steffen's bedroom and photographing the scene. He discovered what he believed to be several crack pipes. He found one in the left drawer of the dresser and two in a white purse inside the closet. He also located a cooler, inside of which he found prescription pill bottles and several clear plastic bags. Two of the bags contained a powdery residue. More photographs were admitted into evidence and published to the jury. These photographs showed the contents of the cooler, a prescription of Suboxone, a silver Samsung cellphone on the dresser, two business cards for A Better Today Recovery Services, and the crack pipe Alejo found in the dresser drawer. Alejo took the cellphone he located into evidence. On cross-examination, Alejo testified to recovering several prescription pill bottles, some of which were labelled and others which were not, a silver skull grinder which contained a green residue, four empty plastic containers which contained green residue, a cardboard pipe, a broken pipe with burnt marks, a gray broken pen with white residue, a burnt Chore Boy pipe, a Tupperware with a purple lid and white residue, and two glass pipes with burnt residue. Alejo testified that he and the other officers did not recover a folded dollar bill which contained heroin at that time.

¶ 28    Detective Jeff Fields of the McHenry County Sheriff's Office was found to be an expert in street level drug sales and testified as follows: He was the lead detective in the investigation into Steffen's death. He obtained a search warrant to examine the contents of the Samsung cellphone taken from Steffen's room. He extracted the cellphone's contents using software called Cellebrite.

Fields identified several deleted text messages on Steffen's phone, which he believed were drug related. On the afternoon of December 22, 2019, Steffen reached out to four contacts, "Joe-n/w," "Scrap," "D-chick," and "Eee." Fields believed these were drug contacts, as the other contacts in his phone were saved by first and last name. Further, Scrap appeared to be a street name, and D-chick was likely short for diesel or dope chick. Of the four contacts Steffen texted, only Eee responded and the following exchange was held:

"December 21, 2019

| | | |
|---|---|---|
| 4:23 PM | Steffen: | Yo what's up with ya how's things lookin |
| 4:26 PM | Eee: | Yo |
| 4:35 PM | Steffen: | Ima hit ya line here in a lil bit |
| 4:36 PM | Eee: | K |
| 5:38 PM | 34s Outgoing Call to Eee | |
| 5:39 PM | 5s Outgoing Call to Eee | |
| 5:40 PM | 49s Incoming Call from Eee | |

December 22, 2019

| | | |
|---|---|---|
| 11:05 AM | 1s Outgoing Call to Eee | |
| 11:06 AM | Steffen: | Yo…. |
| 11:15 AM | 1s Outgoing Call to Eee | |
| 11:19 AM | Steffen: | Got quite a bit coming your way… |
| 11:19 AM | Eee: | Sup |
| 11:20 AM | Eee: | Just callme wen here |
| 11:21 AM | Steffen: | Ok 150 n 150 |
| 11:21 AM | Eee: | Koo |

| | |
|---|---|
| 11:55 AM | Eee: How long |
| 12:20 PM | Steffen: I'm going thru btown right now I'll be to the rock in 15 |
| 12:20 PM | Steffen: Got my ma n kids I need a hop in with you plz |
| 12:37 PM | Steffen: Out here |
| 12:41 PM | 47s Incoming Call from Eee |
| 12:53 PM | Steffen: Here |
| 12:53 PM | Eee: K 10 mins |
| 1:07 PM | 27s Incoming Call from Eee |
| 1:09 PM | 33s Incoming Call from Eee" |

Fields's opinion was that "Ima hit ya line here in a lil bit," meant that Steffen was going to place an order for drugs. "Got quite a bit coming your way…," meant that Steffen was placing a large order. When Steffen texted, "Ok 150 n 150," Fields took that to mean Steffen was ordering $150 of heroin and most likely $150 of crack cocaine. He explained how it was common for addicts to use crack cocaine, which was an upper, to counteract the adverse effects of the heroin, which was a downer. The $150 would get roughly one to two grams of cocaine or heroin, which would fit into a small bag.

¶ 29    Harbor Freight security footage showed that at approximately 1:15 p.m. on December 22, 2019, a black Dodge Charger stopped at the East end of the parking lot near the Wendy's. A man then exited from the front passenger door and walked in the direction of the Wendy's. The Charger then drove away.

¶ 30    An autopsy was performed on Steffen, Doctor Kristin Escobar Alvarenga. The cause of death was determined to be heroin toxicity. Steffen's blood had active and inactive metabolites of heroin, and inactive metabolites of cocaine. Alvarenga could not say with certainty the amount of

heroin Steffen had ingested or when Steffen had last ingested heroin, but it had to have been within one day of his death.

¶ 31                                    D. Defendant's Arrest

¶ 32     Officers from the McHenry County Narcotics Task Force, Rockford Drug Enforcement Agency, and Rockford Police Department Narcotics Division arranged to set up a "bust buy," wherein Fields would set up a drug deal with the Eee contact using Steffen's phone. In all, approximately 15 officers were involved in the operation.

¶ 33     Fields testified that on January 7, 2020, he messaged the Eee contact on Steffen's phone, mimicking the language Steffen had used on December 22, 2019. He asked for "150 N 150" at the same location as last time. Fields messaged Eee that he was driving his stepdad's gray minivan, with the intention of drawing Eee to an unoccupied van the officers had left near the Wendy's. After texting for a while, Eee called and told Fields to come to where he was parked at the side of the Schnuck's grocery store, which was in the same complex as the Wendy's and Harbor Freight. Fields identified the caller's voice as belonging to defendant. Fields tried to get Eee to identify what vehicle he was driving, which caused him to get irritated. Eee called Fields to say, "Get this stuff out of my car."

¶ 34     The officers identified a black Dodge Charger on the side of the Schnucks's parking lot noting that Eee's vehicle as it was the only one with lights on and a single male occupant talking on the phone. As officers began moving in on the car, it exited the parking lot. A marked Rockford Police squad car attempted to stop the black Dodge Charger as it exited onto Trainer Road. The Charger rammed the squad car and kept going south on Trainer Road. The Charger then turned west onto Puri Parkway pursued by police. The Charger turned south onto Puri Drive, which runs between the Harbor Freight and Chili's restaurant, heading towards State Street. Officers then

forced the Charger off the road, and it stopped in the grass near the Chili's. Defendant was removed from the vehicle and arrested.

¶ 35    Two cellphones were recovered from the vehicle. One was a Samsung smartphone and the other was a flip phone. Fields testified that having two phones was indicative of drug dealing, as drug dealers would often have a nicer personal phone and use cheaper pre-paid phones to conduct drug business, as they were less easily traced and could be replaced more easily. Fields called the Eee number on Steffen's phone and confirmed that the contact information was for the flip phone recovered from defendant's vehicle.

¶ 36    A Cellebrite extraction was performed on the flip phone, and it contained the text messages from Fields on January 7, 2020, but not the text messages sent from Steffen on December 22, 2019. The phone logs did however show the phone calls from December 22, 2019. The phone also contained two photographs. One was of the defendant holding money, and the other was of a woman.

¶ 37    Detective Mike Jury of the Rockford Police Department testified that on January 7, 2019, he went to what he believed to be defendant's apartment with the objective of trying to obtain permission to search it. When he arrived, he met with a woman who refused to allow him to search the apartment. He identified her as the woman in the photograph on the flip phone.

¶ 38    Despite searching defendant, the vehicle, and the path of the chase, police were unable to discover any drugs. No officers saw defendant throw anything out of the vehicle during the chase, or otherwise hide anything. Detective Robby Hatfield of the Rockford Police Department testified that following the chase, he asked defendant if he had swallowed any drugs, and defendant responded, "I'll be fine."

¶ 39    The jury found defendant guilty of drug-induced homicide. Defendant was sentenced to nine years' imprisonment. Defendant timely appealed.

¶ 40                                    II. ANALYSIS

¶ 41    Defendant raises two issues on appeal: (1) whether the State proved beyond a reasonable doubt that defendant delivered heroin to Steffen and that Steffen died as a result of ingesting that heroin, and (2) whether defendant received ineffective assistance of counsel, when counsel did not request an additional peremptory challenge to strike a juror whose fiancé's sister had died of a drug overdose.

¶ 42                            A. Sufficiency of the Evidence

¶ 43    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt, as proof of actual delivery of heroin was lacking, and the State failed to prove that Steffen's death did not result from a cause unconnected with defendant.

¶ 44    When a defendant challenges the sufficiency of the evidence against them, the reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261, (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). It is not the role of the reviewing court to retry the defendant, "and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). A defendant's conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory, that a reasonable doubt of the defendant's guilt remains. *Id.*

¶ 45    "The offense of drug-induced homicide has two elements: (1) that the defendant

knowingly, unlawfully delivered a controlled substance and (2) that ingesting that substance was a contributing cause of the victim's death." *People v. Lang*, 2023 IL App (2d) 220091, ¶ 17 (citing 720 ILCS 5/9-3.3(a) (West 2018)).

¶ 46    Defendant argues that the State failed to prove beyond a reasonable doubt that he delivered heroin to Steffen. Defendant argues that the State's theory of the case was speculative, as there were no eyewitnesses to the alleged heroin sale on December 22, 2019, nor were there any eyewitnesses who even placed him in the parking lot. Defendant maintains that while the text messages between Steffen and Eee could indicate a drug deal took place, there are various other possibilities. For instance, Steffen could have actually been paying off an old drug debt, there may have been a transaction for something other than heroin, or that the transaction was for heroin, but the deal fell through. Defendant further argues that the January 7, 2020, attempted transaction fails to establish that the December 22, 2019, meeting was for the sale of heroin, as no narcotics were recovered following the bust.

¶ 47    Defendant also argues that there was insufficient evidence that he contributed to Steffen's death, as Steffen could have obtained the lethal drugs on December 23, 2019, while his family was at the Christmas party, or that they could have been among the belongings his wife brought to him.

¶ 48    We do not find defendant's arguments convincing.

¶ 49    While it is true that there were no witnesses to the alleged December 22, 2019, heroin purchase, circumstantial evidence is sufficient to sustain a criminal conviction. See *People v. Galarza*, 2023 IL 127678, ¶ 27 (" 'Circumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged.' " (quoting *People v. Hall*, 194 Ill. 2d 305, 330 (2000))). The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the circumstantial chain, so long

as the evidence taken as a whole satisfies the trier of fact as to the defendant's guilt beyond a reasonable doubt. *Hall*, 194 Ill. 2d at 330. "A trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor must the trier of fact search out all possible explanations consistent with innocence and raise those explanations to a level of reasonable doubt." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60.

¶ 50    The evidence that Steffen died as a result of a heroin overdose and that he possessed heroin within the folded dollar bill is uncontroverted. The testimony of Steffen's family showed that he had a limited number of opportunities to obtain heroin. He had never lived in Wonder Lake before December 21, 2019, and his mother had checked the room before he came to live with her. He had limited access to money or the family's vehicles. From December 21, 2019, to December 24, 2019, no one except family came to visit the home. Defendant was alone on only two occasions in that time period: on December 22, 2019, when he left his mother to go to the Harbor Freight parking lot, and on December 23, 2019, when the family went to a Christmas party.

¶ 51    Fields testified that, in his opinion, the conversation between Steffen and Eee was to arrange for the purchase of $150 of heroin and $150 of cocaine. This is corroborated by the fact that the phone conversation was deleted from Steffen's phone and the Eee phone, which is indicative of consciousness of guilt. See *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 96; *People v. Price*, 2021 IL App (4th) 190043, ¶ 127.

¶ 52    When Fields arranged another buy from Eee on January 7, 2020, using Steffen's phone, defendant came to meet him at the same shopping complex that Jones took Steffen to on December 22, 2019. Defendant's flight from the parking lot shows consciousness of guilt. *People v. Harris*, 225 Ill. 2d 1, 23 (2007). Following defendant's arrest, despite defendant being the only occupant of the vehicle, police recovered two phones from the vehicle, a Samsung smartphone and a flip

phone which was associated with the Eee contact on Steffen's phone. Fields testified that the use of a nicer personal phone and a cheap burner phone was consistent with drug dealing. The flip phone contained a photograph of defendant holding cash, and a photograph of a woman who was at defendant's apartment.

¶ 53   Defendant was the owner of the black Dodge Charger he had been driving when he was arrested. Surveillance footage from December 22, 2019, showed a black Dodge Charger dropping someone off on the side of the Harbor Freight parking lot closest to the Wendy's, and that person walking away in the direction of the Wendy's, where Steffen's mother was waiting for him.

¶ 54   Regarding defendant's contention that the meeting on December 22, 2019, may have actually been to repay a drug debt, this is undercut by the fact that Steffen obtained and ingested heroin. It is also undercut by the fact that the text messages with Eee make no reference to a debt, and that when Fields used the same language to set up the buy on January 7, 2020, defendant called to tell him, "Get this stuff out of my car."

¶ 55   As for the assertion that the sale may have been for something other than heroin, there is no indication that the transaction was for something other than heroin and possibly cocaine. Steffen was not found to be in possession of anything which would indicate the sale was for anything else.

¶ 56   Finally, defendant asserts that the December 22, 2019, transaction may have fallen through, but again, Steffen was found to have ingested and possessed heroin. Further, his phone records do not indicate any other efforts to obtain drugs.

¶ 57   Despite the fact that no one witnessed an actual transaction on December 22, 2019, and that no narcotics were recovered at the January 7, 2020, "bust buy," the jury could have found beyond a reasonable doubt that defendant had sold heroin to the defendant.

¶ 58    Regarding defendant's assertion that the state failed to prove that Steffen's death was not caused by a cause unrelated to the defendant, the uncontroverted evidence showed that Steffen died as a result of a heroin overdose. There was evidence that Steffen had limited opportunities to obtain heroin and there was significant circumstantial evidence that Steffen obtained heroin from defendant on December 22, 2019. Although defendant argues that Steffen could have obtained the heroin when Jacqueline brought him his possessions on December 21, 2019, or when his family left him alone to go to the Christmas party on December 23, 2019, these arguments are purely speculative and do not render the State's evidence insufficient.

¶ 59    Regarding Jacqueline possibly bringing Steffen the drugs, Jacqueline testified that Steffen was a daily heroin user, and Fields testified that drug addicts do not stockpile heroin. This cuts against the notion that Steffen may have hidden heroin in the belongings which Jacqueline brought him. Further, Steffen's deleted messages to Eee and the other purported drug dealers began shortly after Jacqueline had delivered Steffen's belongings. Had the dollar bill with heroin been among the possessions Jacqueline brought over, Steffen would not have needed to seek to purchase drugs at that time. "It is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters." *People v. Brooks*, 187 Ill. 2d 91, 132 (1999).

¶ 60    As for the possibility that Steffen procured the lethal heroin on the evening of December 23, 2019, while the rest of the family was away at the Christmas party, defendant contends that even without access to a vehicle or bank account, Steffen could have stolen cash or valuables from someone in the home, and either been visited by someone or walked to purchase drugs. However, there was no testimony or other evidence to show that any cash or valuables were stolen from the

home, and Steffen's phone records do not show any communications which would indicate he arranged to purchase drugs on December 23, 2019. Defendant's proposition seems to be then that Steffen could simply have gone for a walk in an unfamiliar residential area in late December and found someone who was selling heroin, which strains credulity.

¶ 61     Based on the totality of the evidence, a rational jury could have found beyond a reasonable doubt that defendant sold Steffen heroin, that Steffen ingested a portion of that heroin, and that Steffen died as a result. As such, the evidence was sufficient to support defendant's conviction for drug-induced homicide.

¶ 62                              B. Ineffective Assistance of Counsel

¶ 63     Defendant argues that he received ineffective assistance of counsel when trial counsel failed to take available measures to exclude Ms. R., whose fiancé's sister died from heroin, from the jury on the mistaken belief that he had "no choice" but to accept her. Defendant maintains that trial counsel's performance was deficient in that he misunderstood that he could request an additional peremptory challenge or move to reconsider an earlier improper for cause denial—such as the denial of defendant and the State's joint request to strike Mr. A.—to gain an additional peremptory challenge. See *People v. Bowens*, 407 Ill. App. 3d 1094, 1098 (2011); and *People v. Washington,* 104 Ill. App. 3d 386, 392 (1982).

¶ 64     The State argues, *inter alia*, that defendant has forfeited his argument regarding ineffective assistance of trial counsel on appeal, as defendant retained new counsel posttrial, and posttrial counsel did not amend defendant's posttrial motion to include this issue. See *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003).

¶ 65     To preserve an issue for appeal, a defendant must typically raise the issue in an objection at trial and a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The failure to do so

constitutes a forfeiture of the issue on appeal. *Id.* However, for a claim of ineffective assistance of counsel, trial counsel is not expected to argue their own ineffectiveness in a posttrial motion. *Ramos*, 339 Ill. App. 3d at 900. Yet, where the posttrial motion is drafted by different counsel, normal forfeiture rules apply. *Id.*

¶ 66     In the instant case, defendant was represented at trial by Hal Garfinkel. Mr. Garfinkel also prepared defendant's posttrial motion. At defendant's sentencing hearing, Steve Greenberg moved to substitute as defendant's counsel. That motion was granted, and Mr. Garfinkel was allowed to withdraw as counsel. Mr. Greenberg indicated that he had been retained to handle defendant's appeal, and, in order to avoid any waiver issues, he suggested that he come in to review the transcript and trial materials to determine if he needed to file an amended posttrial motion. Mr. Greenberg had initially filed a motion requesting a 60-day continuance in which to file an amended posttrial motion. The trial court indicated that it was willing to consider the motion, but as the trial judge was soon retiring, Mr. Greenberg indicated that he would be proceeding on the posttrial motion as filed by Mr. Garfinkel. An order was entered indicating defendant had withdrawn his request for a continuance. Defendant thereby forfeited the instant issue of ineffective assistance of counsel. See *Ramos*, 339 Ill. App. 3d at 900.

¶ 67     Mr. Greenberg did not ultimately draft defendant's appellate brief, which was prepared by the Office of the State Appellate Defender. Mr. Greenberg did, however, file defendant's reply brief, which makes no reference to defendant's ineffective assistance of counsel claim, or the State's arguments against it. Additionally, at oral argument, Mr. Greenberg indicated that he would not be proceeding on the issue of ineffective assistance of counsel and would only be arguing the issue of the sufficiency of the evidence.

¶ 68     Although forfeiture is a limitation on the parties and not the court (*People v. Sophanavong*,

2020 IL 124337, ¶ 21), we decline to consider defendant's claim for ineffective assistance of counsel, as Defendant failed to preserve the issue in a posttrial motion and chose not to respond to the State's forfeiture argument on appeal. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) ("In the absence of a plain-error argument by a defendant, we will generally honor the defendant's procedural default.").

¶ 69                                    III. CONCLUSION

¶ 70     For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 71     Affirmed.